EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Nancy Sierra Lugo <br><br> Recurrida <br><br> v. <br><br> Sunrun PR Operations, LLC; Máximo Solar Industries, Inc., Aseguradoras ABC, John Doe y Richard Roe <br><br> Peticionarios | Certiorari <br><br> 2026 TSPR 76 <br><br> 218 DPR ___ |

Número del Caso:  CC-2024-0599


Fecha:  10 de julio de 2026


Tribunal de Apelaciones:

    Panel IX


Representantes legales de la parte peticionaria:

    Lcdo. Jorge Fernández Reboredo
    Lcdo. Pedro J. Cruz Pérez


Representante legal del recurrido:

    Lcdo. Rafael Román Jiménez


Materia: Obligaciones y Contratos; Arbitraje – Si corresponde al tribunal o al árbitro adjudicar planteamientos dirigidos a impugnar el consentimiento contractual cuando el contrato contiene una cláusula de arbitraje que delega expresamente en el árbitro la determinación de su alcance o aplicabilidad, y que además establece que el proceso se regirá por la Ley Federal de Arbitraje.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Nancy Sierra Lugo<br><br>Recurrida<br><br>v.<br><br>Sunrun PR Operations, LLC;<br>Máximo Solar Industries,<br>Inc., Aseguradoras ABC, John<br>Doe y Richard Roe<br><br>Peticionarios | CC-2024-0599 | *Certiorari* |

Opinión del Tribunal emitida por la Jueza Asociada Rivera Pérez.

En San Juan, Puerto Rico a 10 de julio de 2026.

En el presente caso, examinamos si corresponde al tribunal o al árbitro adjudicar planteamientos dirigidos a impugnar el consentimiento contractual cuando el contrato contiene una cláusula de arbitraje que delega expresamente en el árbitro la determinación de su alcance o aplicabilidad, y que además establece que el proceso se regirá por la Ley Federal de Arbitraje.

Resolvemos que, ante la ausencia de alegaciones dirigidas a impugnar la validez de la cláusula de delegación, el foro judicial carece de facultad para adjudicar controversias relacionadas con la validez, alcance o aplicabilidad del acuerdo arbitral. En tales circunstancias, corresponde al árbitro atender los planteamientos

formulados, toda vez que las partes, en virtud de lo pactado, le delegaron expresamente la facultad de decidir sobre su propia jurisdicción.

## I.

El 7 de septiembre de 2020, la Sra. Nancy Sierra Lugo (recurrida) suscribió un contrato para el arrendamiento de un sistema solar fotovoltaico con Sunrun PR Operations, LLC (Sunrun), que sería instalado en su residencia.[1] En dicho contrato se acordó que, **de no poder resolver las disputas de manera informal, el arbitraje sería el único medio de resolución de controversias, incluyendo aquellas que versaban sobre su alcance o aplicabilidad.**[2]

Insatisfecha con la ejecución del contrato aludido, el 4 de diciembre de 2023, la señora Sierra Lugo presentó una Demanda sobre incumplimiento de contrato y daños y perjuicios contra Sunrun, Máximo Solar Industries, Inc. (Máximo Solar o peticionario), y sus respectivas aseguradoras.[3] En síntesis, alegó que el sistema solar fue instalado en su residencia, pero falló a las pocas semanas y nunca llegó a funcionar adecuadamente y que, pese a múltiples gestiones realizadas ante ambas compañías para corregir la avería, incluyendo llamadas, citas y promesas de servicio no cumplidas, el sistema permaneció inoperante por más de un año. Aunque le fue concedido un crédito parcial, la señora

---

[1] Véase Apéndice del recurso, págs. 138-178.
[2] Íd., págs. 155-156.
[3] Íd., págs. 69-78. Las aseguradoras fueron designadas con nombres ficticios, conforme a lo dispuesto en la Regla 15.4 de Procedimiento Civil, 32 LPRA Ap. V.

Sierra Lugo sostuvo que su situación no fue resuelta y que persistía el incumplimiento de las obligaciones contractuales asumidas por las partes demandadas.

En vista de ello, la recurrida solicitó al foro primario que decretara la resolución del contrato, ordenara la remoción del equipo instalado y que se le reembolsaran las sumas pagadas durante la vigencia de este. Además, reclamó una indemnización por los daños contractuales sufridos, incluyendo el costo de continuar utilizando el servicio de energía eléctrica provisto por LUMA Energy, así como por los daños extracontractuales y las angustias mentales sufridas.

Asimismo, la recurrida planteó que **su consentimiento estuvo viciado y bajo la errónea impresión —inducida por alegadas falsas representaciones— de que lo hacía con Máximo Solar**, y no con Sunrun.[4] En consecuencia, también solicitó que se declarara la nulidad del contrato.

---

[4] La alegación ocho (8) de la Demanda lee:

En todo momento la codemandada **MAXIMO SOLAR INDUSTRIES, INC.** había representado a la parte demandante que era con ella con quien había otorgado el Contrato. Téngase en cuenta que fue con la codemandada **MAXIMO SOLAR INDUSTRIES, INC.** con quien la parte demandante siempre se comunicó a través de sus empleados o representantes. Varios meses después de la instalación, -y ante la falta de funcionamiento del sistema solar fotovoltaico instalado-, la parte demandante requirió copia del Contrato que nunca había recibido. Es entonces cuando la parte demandante advino en conocimiento de que con quien había otorgado el Contrato era con la codemandada **SUNRUN PR OPERATIONS, LLC.** (Negrillas en el original).

Específicamente expuso en la alegación 33 de la Demanda lo siguiente:

Ante el reiterado, craso y contumaz incumplimiento de las partes demandadas con su obligación contractual, la parte compareciente solicita la resolución del Contrato y el pago de las prestaciones, así como los daños y perjuicios sufridos como consecuencia del incumplimiento contractual. Además, el consentimiento de la parte demandante estuvo viciado, pues mediante falsas representaciones y maquinaciones insidiosas se le hizo creer que con quien estaba contratando era con la codemandada **MAXIMO SOLAR INDUSTRIES, INC., a lo que hay que añadir que la parte demandante firmó el Contrato electrónicamente sin que se le proveyera la oportunidad de**

Luego de varios trámites procesales,[5] el 8 de marzo de 2024, Máximo Solar presentó una Solicitud de desestimación al amparo de la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V.[6] En su escrito, alegó que el contrato suscrito por la recurrida y Sunrun contenía una cláusula de arbitraje válida, mediante la cual las partes se obligaron a resolver cualquier disputa o controversia mediante dicho mecanismo. Argumentó que esta cláusula era exigible conforme a derecho y que, en consecuencia, el Tribunal debía desestimar la demanda por falta de jurisdicción, ya que la controversia debía ventilarse ante un foro arbitral. **Añadió que la señora Sierra Lugo no había formulado alegaciones específicas de fraude en relación con dicha cláusula arbitral.**

En la alternativa, Máximo Solar planteó que no debía figurar como parte en el pleito, ya que actuó únicamente como contratista autorizado para la instalación del sistema en representación de Sunrun. Además, alegó que la Demanda debía ser desestimada por falta de parte indispensable, ya que una de las partes contratantes —Sunrun— no había comparecido al pleito.

En su Oposición a solicitud de desestimación, la recurrida alegó que existían hechos materiales en controversia que impedían la desestimación del pleito sin

---

**revisarlo y leerlo. Por consiguiente, el Contrato objeto de la presente reclamación es nulo.** (Negrillas en el original).

[5] Entre estos trámites, está la presentación de una contestación a la demanda por parte de Máximo Solar y el traslado del caso al Tribunal de Primera Instancia, Sala Superior de Aguadilla, por ser el foro correspondiente según la ubicación de la oficina principal de Sunrun.

[6] Véase Apéndice del recurso, págs. 120-178.

antes celebrar una vista evidenciaria. **Argumentó entonces, luego de exponer el derecho aplicable, que la cláusula de arbitraje era nula e ineficaz por haber sido incluida mediante fraude y engaño.**[7] Además, añadió que el acuerdo surgió de un contrato de adhesión, por lo que cualquier ambigüedad debía interpretarse a su favor conforme dispone el Código Civil y la jurisprudencia para este tipo de contratos. Finalmente, rechazó el señalamiento de falta de parte indispensable, aclarando que Sunrun fue debidamente emplazada y que, incluso, había solicitado la anotación de rebeldía por su incomparecencia.

El 15 de mayo de 2024, el Tribunal de Primera Instancia acogió la solicitud de desestimación presentada por Máximo Solar y dictó una Sentencia, mediante la cual **desestimó con perjuicio** la Demanda.[8] El foro primario concluyó que la cláusula de arbitraje pactada en el contrato era válida, exigible e irrevocable, conforme a la Ley Núm. 376 de 8 de mayo de 1951, según enmendada, Ley de Arbitraje Comercial en Puerto Rico, 32 LPRA sec. 3201 *et seq.*, (Ley de Arbitraje Comercial de 1951),[9] y a la Federal Arbitration Act (FAA), 9 USC sec. 1 *et seq*. Además, aunque Máximo Solar argumentó que

---

[7] La alegación 24 de la Oposición a solicitud de desestimación lee: "No obstante lo anterior, es la posición de la parte demandante que la cláusula de arbitraje fue incluida en el contrato como resultado de fraude y engaño. Por consiguiente, dicha cláusula de arbitraje es nula e ineficaz. Además, la parte demandante nunca ha reconocido tácitamente que el acuerdo de arbitraje sea válido". Véase Apéndice del recurso, pág. 186.

[8] Íd., págs. 17-25.

[9] Dicha ley fue derogada por la Ley Núm. 147 de 9 de agosto de 2024, *Ley de Arbitraje de Puerto Rico*, 32 LPRA sec. 3230 *et seq*. Sin embargo, se cita el estatuto derogado, por ser el vigente al momento de los hechos en controversia.

la Demanda carecía de una reclamación con derecho a remedio, el Tribunal de Primera Instancia ultimó que la cláusula de arbitraje pactada era lo suficientemente amplia para incluir controversias relacionadas sobre diseño e instalación, y aspectos vinculados a la participación de Máximo Solar como socio de instalación.[10]

Finalmente, en cuanto a la alegación de fraude que hiciera la señora Sierra Lugo en la Demanda, el Tribunal determinó que **no cumplió con el requisito de especificidad de la Regla 7.2 de Procedimiento Civil, 32 LPRA Ap. V.** Asimismo, descartó la alegación de falta de parte indispensable, tras constatar que Sunrun había sido debidamente emplazada.

En desacuerdo con esa determinación, el 17 de junio de 2024, la señora Lugo Sierra presentó un recurso de apelación ante el Tribunal de Apelaciones. En esencia, alegó que el foro de primera instancia erró al desestimar su Demanda sin permitirle presentar evidencia sobre el alegado fraude en la contratación. Por su parte, el 29 de julio de 2024, Máximo Solar presentó un Alegato en oposición a recurso de apelación.

Luego de evaluar los planteamientos de las partes, el 7 de agosto de 2024, el Tribunal de Apelaciones dictó la Sentencia recurrida, mediante la cual revocó la decisión del Tribunal de Primera Instancia y **devolvió el caso para la celebración de una vista evidenciaria dirigida a evaluar la**

---

[10] Véase Apéndice del recurso, pág. 24.

**validez de la cláusula de arbitraje contenida en el contrato.**[11]

Inconforme, Máximo Solar presentó una *Moción de Reconsideración*, la cual fue declarada "no ha lugar".

Aun en desacuerdo con el dictamen, Máximo Solar presentó ante este Tribunal un recurso de *certiorari*, y señaló los siguientes errores:

> ERRÓ EL TRIBUNAL DE APELACIONES AL REVOCAR LA DESESTIMACIÓN A LA DEMANDA POR EL FORO PRIMARIO ANTE LA DEFENSA AFIRMATIVA DE MÁXIMO SOLAR SOBRE LA EXISTENCIA DE UN ACUERDO DE ARBITRAJE ENTRE LAS PARTES.
>
> ERRÓ EL TRIBUNAL DE APELACIONES AL ENTENDER QUE LA MERA POSIBILIDAD DE LA EXISTENCIA DE FRAUDE O ENGAÑO ERA SUFICIENTE PARA CONTROVERTIR EL HECHO MATERIAL Y PRESUNCIÓN SOBRE LA VALIDEZ DE LA CLÁUSULA ARBITRAL.
>
> ERRÓ EL TRIBUNAL DE APELACIONES AL ORDENAR LA CELEBRACIÓN DE UNA VISTA EVIDENCIARIA CUANDO EL FORO PRIMARIO EJERCIÓ PROPIAMENTE SU DISCRECIÓN Y ATENDIÓ EL RECURSO DE FALTA DE JURISDICCIÓN SOBRE LA PERSONA, EVALUANDO LOS DOCUMENTOS Y ESCRITOS QUE OBRABAN EN EL EXPEDIENTE.

Expedido el auto de *certiorari*, y con el beneficio de la comparecencia de las partes, procedemos a exponer el marco jurídico aplicable a la controversia ante nuestra consideración.

**II.**

**A. Teoría general de las obligaciones y contratos.**

Como es conocido en nuestro ordenamiento los contratos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o a

---

[11] Íd., págs. 3-15.

prestar algún servicio. Art. 1206 del Código Civil de 1930 (derogado), 31 LPRA sec. 3371;[12] *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 886 (2008); *Collazo Vázquez v. Huertas Infante*, 171 DPR 84, 102 (2007). Concretamente, existe un contrato cuando concurren los requisitos siguientes: (1) consentimiento de los contratantes; (2) objeto cierto que sea materia del contrato; y (3) causa de la obligación que se establezca. Art. 1213 del Código Civil (derogado), 31 LPRA sec. 3391; *García Reyes v. Cruz Auto Corp., supra*. Una vez concurren las condiciones esenciales para su validez, un contrato es obligatorio "cualquiera que sea la forma en que se haya celebrado". Art. 1230 del Código Civil de 1930 (derogado), 31 LPRA sec. 3451.

En nuestra jurisdicción, rige la libertad de contratación, por lo que las partes contratantes pueden establecer los pactos, las cláusulas y las condiciones que tengan por convenientes, siempre que no sean contrarias a la ley, a la moral y al orden público. Art. 1207 del Código Civil de 1930 (derogado), 31 LPRA sec. 3372; *Coop. Sabaneña v. Casiano Rivera*, 184 DPR 169, 173-174 (2011); *Guadalupe Solís v. González Durieux*, 172 DPR 676, 683 (2007). Además, "[e]l principio contractual de *pacta sunt servanda* establece la obligatoriedad del contrato según sus términos y las

---

[12] El presente contrato se formalizó el 7 de noviembre de 2020, según surge de la prueba documental que obra en el expediente. A esa fecha, estaba vigente el Código Civil de 1930, por lo cual, sus disposiciones son aplicables al recurso instado ante esta Curia. El Código Civil de Puerto Rico de 2020 (Ley Núm. 55-2020) entró en vigor el 28 de noviembre de 2020.

consecuencias necesarias derivadas de la buena fe". *BPPR v. Sucn. Talavera*, 174 DPR 686, 693 (2008).

De otra parte, en ocasiones algunos contratos requieren que se realice un ejercicio de interpretación para poder determinar la naturaleza de las obligaciones en que incurrieron las partes contratantes. *Nissen Holland v. Genthaller*, 172 DPR 503, 513 (2007); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 725-726 (2001). En ese sentido, hemos reiterado que, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Art. 1233 del Código Civil de 1930 (derogado), 31 LPRA sec. 3471; *Carmona, Negrón v. BSN y otros*, 214 DPR 388 (2024); *Guadalupe Solís v. González Durieux*, supra, pág. 684.

En cambio, cuando la voluntad o intención de las partes contratantes no se puede determinar a partir de una lectura literal de las cláusulas contractuales, entonces se debe recurrir a la evidencia extrínseca para juzgarla. *Nissen Holland v. Genthaller, supra*, págs. 518-519. A tales fines, procede considerar, entre otros factores, los actos anteriores, coetáneos y posteriores de los contratantes, así como el uso o costumbre y demás circunstancias que revelen la intención contractual. Íd.

**B. Los contratos de adhesión.**

Los contratos de adhesión son aquellos contratos en cuya redacción no interviene una de las partes y en los que el desequilibrio de poder entre las partes impide un

verdadero proceso previo de negociación. *Suárez Figueroa v. Sabanera Real, Inc.*, 173 DPR 694, 711 (2008). Toda vez que, en esta modalidad de contratación, "'no consiente la deliberación previa, y, por tanto, es rígidamente uniforme', la realidad del consumidor queda ceñida a decidir entre aceptar en su totalidad el esquema unilateralmente estructurado por el predisponente [,] o retirarse del negocio". (nota al calce omitida). *Íd.*, pág. 712.

En atención a lo anterior, la doctrina y la jurisprudencia coinciden en que la interpretación de los contratos de adhesión debe favorecer a la parte que nada tuvo que ver con su redacción. *Coop. Sabaneña v. Casiano Rivera*, *supra*, págs. 176-177. El propósito, según hemos expresado, es "promover, hasta donde ello sea posible, la igualdad jurídica en materia de contratación". *Suárez Figueroa v. Sabanera Real, Inc., supra*, a la pág. 712. **No obstante, esto no significa que, al dilucidar controversias sobre este tipo de contratos, las mismas siempre deban interpretarse de manera irrazonable y mucho menos que este tipo de contratos estén viciados de nulidad. Tan solo significa que el análisis de los contratos de adhesión se realizará razonablemente del modo favorable a la parte más débil.** *Coop. Sabaneña v. Casiano Rivera*, *supra*, págs. 176-177.

Además, solamente cuando el contrato de adhesión contiene cláusulas oscuras o ambiguas se activa la norma de interpretación que requiere que toda duda debe resolverse

contra la parte que redactó el contrato. **En ausencia de ambigüedad u oscuridad, el contrato debe ser interpretado según sus términos.** *Coop. Sabaneña v. Casiano Rivera*, *supra,* pág. 177; *S.L.G. Ortiz-Alvarado v. Great American*, 182 DPR 48, 72 (2011).

Por último, y en lo aquí pertinente, destacamos que en *Aponte Valentín v. Pfizer Pharm.,* 208 DPR 263, 282, 286-287 (2021), reiteramos que un contrato típico de adhesión,

> no significa que esté viciado de nulidad. *Arthur Young & Co. v. Vega III*, 136 DPR 157, 166 esc. 9 (1994); *C.R.U.V. v. Peña Ubiles*, 95 DPR 311, 314 (1967); *Casanova v. P.R.-Amer. Ins. Co.*, 106 DPR 689, 697 (1978). Así pues, **solo cuando el contrato de adhesión contiene cláusulas ambiguas es que se activa la norma de interpretación contra la parte que lo redactó.** Véase *Arthur Young & Co. v. Vega III*, *supra*, pág. 166 esc. 9. (Negrillas suplidas).

**C. La cláusula de arbitraje.**

En Puerto Rico existe una fuerte política pública a favor de la utilización del arbitraje como método alterno para la solución de disputas y **toda duda sobre su procedencia debe resolverse en la afirmativa.** *Municipio Mayagüez v. Lebrón*, 167 DPR 713, 721 (2006). Esta política pública se recogía en la Ley de Arbitraje Comercial de 1951,[13] y

---

[13] Dado que el contrato fue suscrito en 2020 y la acción judicial se instó en el 2023, resulta aplicable la Ley de Arbitraje de 1951, *supra*. La Ley Núm. 147-2024, *Ley de Arbitraje de Puerto Rico*, 32 LPRA sec. 3230 et seq., aunque no aplicable al presente caso, consolidó en un solo cuerpo normativo el régimen aplicable al arbitraje doméstico e internacional. Exposición de Motivos, Ley Núm. 147-2024, *supra*, pág. 1. Además, la nueva Ley persigue tres objetivos fundamentales: (1) actualizar las normas aplicables cuando las partes no eligen una organización arbitral o cuando se requiere complementar sus reglas; (2) fomentar el estudio y la práctica del arbitraje como método alterno de solución de disputas; y (3) adaptar la normativa de arbitraje comercial internacional a la cultura jurídica local, conservando los principios inspirados en la Ley Modelo de la UNCITRAL. Íd., págs. 1-2. Esta legislación también delimita el alcance y la eficacia de los acuerdos

respondía al "interés del Estado de facilitar la solución de disputas por la vía más rápida, flexible y menos onerosa que los tribunales para la resolución de controversias que emanan de la relación contractual entre las partes". *H.R., Inc. v. Vissepó & Diez Constr.*, 190 DPR 597, 605 (2014).

La Ley de Arbitraje Comercial del 1951 fue aprobada con el propósito de autorizar, reglamentar y hacer exigibles los convenios de arbitraje comercial en Puerto Rico, y derogó expresamente las disposiciones del ordenamiento español que regían previamente en esta materia.[14] Exposición de Motivos de la Ley de Arbitraje Comercial de 1951. Esta Ley fue redactada utilizando como modelo la Ley Federal de Arbitraje, comúnmente conocida como Federal Arbitration Act (FAA), 9 USCA sec. 1 *et seq. S.L.G. Méndez-Acevedo v. Nieves Rivera*, 179 DPR 359, 369 (2010). Por consiguiente, la jurisprudencia interpretativa del estatuto federal aludido nos sirve de guía en la disposición de los casos en la jurisdicción local. Íd.

Al igual que la FAA, la Ley de Arbitraje Comercial de 1951 reflejó el principio fundamental de que el arbitraje es un asunto contractual. *Aponte Valentín et al. v. Pfizer Pharm.*, *supra*, pág. 282; *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 720. Véase, además, *Rent-A-Center, West,*

_____

de arbitraje, así como la distribución de responsabilidades entre los tribunales y los árbitros en torno a su interpretación y ejecución. Véase, Art. 2.03 de la Ley Núm. 147-2024, 32 LPRA sec. 3231b.

[14] Artículos 790 al 839 y 437 de la Ley de Enjuiciamiento Civil para España y Ultramar, promulgada por Real Decreto de 3 de febrero de 1881. Véase, Exposición de Motivos de la derogada Ley de Arbitraje Comercial de 1951.

*Inc. v. Jackson*, 561 US 63, 67 (2010). En su Artículo 1, la Ley de Arbitraje Comercial de 1951, 32 LPRA sec. 3201, disponía:

> Dos o más partes podían convenir por escrito en someter a arbitraje, conforme a las disposiciones de esa Ley, cualquier controversia que pudiera ser objeto de una acción existente entre ellas a la fecha del convenio; o bien incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que surgiera en el futuro entre ellas, derivada de dicho acuerdo o relacionada con este. Tal convenio será válido, exigible, e irrevocable **salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio.** (Negrillas suplidas).[15]

Por lo tanto, aun ante la fuerte política pública que lo favorece, el arbitraje solo puede exigirse cuando se ha pactado y en los términos acordados. *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 368; *Crufon Const. v. Aut. Edif. Púbs.,* 156 DPR 197, 205 (2002); *H.R., Inc. v. Vissepó & Diez Const. Corp., supra,* pág. 605.

Por otra parte, hemos señalado que las partes están obligadas a cumplir con los acuerdos de arbitraje, en virtud del principio de la buena fe contractual que rige en nuestro ordenamiento jurídico. *Constructora Estelar v. Aut. Edif. Púb.*, 183 DPR 1, 41-42 (2011); *Méndez Jiménez v. Carso Const.*, 202 DPR 554, 558-559 (2019). Este principio "exige no defraudar la confianza que el otro ha puesto en una

---

[15] Destacamos que la Ley Federal de Arbitraje dispone que: "A written provision in […] a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract […] **shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract**". (Negrillas suplidas). 9 USCA sec. 2.

promesa o conducta". *Constructora Estelar v. Aut. Edif. Púb.,*
*supra*, pág. 41. Véase, además, *Aponte Valentín v. Pfizer*
*Pharm., supra*, pág. 287. "[U]na vez acordado el arbitraje,
los tribunales carecen de discreción respecto a su eficacia
y tienen que dar cumplimiento al arbitraje acordado." *S.L.G.*
Méndez-Acevedo *v. Nieves Rivera*, *supra*, pág. 368; *Municipio*
*Mayagüez v. Lebrón, supra*, pág. 721. Véase, además, *Moses H.*
*Cone Hosp. v. Mercury Constr. Corp.*, 460 US 1, 24 (1983).

Cónsono con ello, el Art. 3 de la Ley de Arbitraje
Comercial de 1951, 32 LPRA sec. 3203, disponía lo siguiente:

> Si cualquiera de las partes de un convenio escrito
> de arbitraje incoare acción u otro recurso en
> derecho, el tribunal ante la cual dicha acción o
> recurso estuviere pendiente, **una vez satisfecha de**
> **que cualquier controversia envuelta en dicha acción**
> **o recurso puede someterse a arbitraje al amparo de**
> **dicho convenio, dictará, a moción de cualquiera de**
> **las partes del convenio de arbitraje, la suspensión**
> **de la acción o recurso hasta tanto se haya procedido**
> **al arbitraje de conformidad con el convenio.**
> (Negrillas suplidas).

De igual manera, la sec. 3 de la FAA dispone que:

> If any suit or proceeding be brought in any of
> the courts of the United States upon any issue
> referable to arbitration under an agreement in
> writing for such arbitration, the court in which
> such suit is pending, upon being satisfied that the
> issue involved in such suit or proceeding is
> referable to arbitration under such an agreement,
> **shall on application of one of the parties stay the**
> **trial of the action until such arbitration has been**
> **had in accordance with the terms of the agreement,**
> **providing the applicant for the stay is not in**
> **default in proceeding with such arbitration.**
> (Negrillas suplidas)

En *Smith v. Spizzirri*, 601 US 472 (2024) el Tribunal
Supremo de los Estados Unidos interpretó el referido
estatuto. En este caso, luego de concedido el *removal* a la

Corte de Distrito de los Estados Unidos para el Distrito de Arizona, los demandados solicitaron al tribunal que se **ordenara el arbitraje y se desestimara la demanda**. Alegaron que todas las controversias instadas en la demanda eran arbitrables. Los demandantes admitieron que todas las controversias eran arbitrables, sin embargo, no procedía la desestimación de la demanda debido a que conforme a la sec. 3 de la FAA lo que procedía era la suspensión de los procedimientos. El Tribunal de distrito emitió una orden obligando a las partes a someterse a arbitraje y desestimó la demanda sin perjuicio.

Posteriormente, el Tribunal de Apelaciones del Noveno Circuito de los Estados Unidos confirmó la sentencia. Señaló que conforme a varias sentencias previas, emitidas por el Circuito, se reconoce la discreción que tiene el tribunal para desestimar la demanda.[16] El Tribunal Supremo de los Estados Unidos expidió el recurso de *certiorari*. Analizada la controversia, resolvió que la sec. 3 de la FAA obliga (compels) al tribunal a suspender el procedimiento, y no tiene discreción para desestimar una demanda bajo el fundamento de que todas las reclamaciones están sujetas a arbitraje.[17] Además, expresó que:

---

[16] La Jueza Senior, Susan P. Graber emitió un voto concurrente al cual se le unió la Jueza Roopali H. Desai, en el que sostuvo que la postura del Noveno Circuito era errónea y solicitó al Tribunal Supremo a abordar la controversia ya que "los tribunales de apelación están divididos" en cuanto a si procede la desestimación sin perjuicio o la suspensión de los procedimientos.

[17] "In this statutory interpretation case, text, structure, and purpose all point to the same conclusion: When a federal court finds that a dispute is subject to arbitration, and a party has requested a stay of the court proceeding pending arbitration, the court does not have

Keeping the suit on the court's docket makes good sense in light of this potential ongoing role, and it avoids costs and complications that might arise if a party were required to bring a new suit and pay a new filing fee to invoke the FAA's procedural protections. Id., pág. 6.

De otra parte, el arbitraje es un mecanismo para resolver únicamente aquellas controversias que las partes han acordado someter a arbitraje. Como norma general, es función del tribunal auscultar la intención de las partes para determinar cuáles son las controversias que pactaron arbitrar, toda vez que, "[siendo el arbitraje] un asunto contractual no se puede obligar a una parte a someter a arbitraje una disputa que dicha parte no ha acordado someter". *Crufon Const. Corp. v. Aut. Edif. Púbs.*, *supra*, pág. 205.

En ese sentido, una de las controversias que suelen suscitarse en estos pleitos es si el acuerdo de arbitraje crea el deber de arbitrar una controversia en particular. Esto es lo que se conoce como arbitrabilidad. *World Films, Inc. v. Paramount Pict. Corp.*, 125 DPR 352, 361 (1990), citando a *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643 (1986).

Por otro lado, conforme al Art. 4 de la Ley de Arbitraje Comercial de 1951, 32 LPRA sec. 3204, corresponde a los tribunales atender las controversias sobre la existencia o

---

discretion to dismiss the suit on the basis that all the claims are subject to arbitration."(nota al calce omitida). Id., pág.3 "When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, §3 of the FAA compels the court to stay the proceeding." Id., pag. 6.

validez del convenio de arbitraje o el incumplimiento de este. "La determinación de si un acuerdo crea el deber de las partes de arbitrar una controversia en particular es tarea judicial". *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, págs. 367-368, citando a *World Films, Inc. v. Paramount Pict. Corp., supra*, pág. 361. Anteriormente, hemos identificado tres modalidades de esa controversia: (1) si existe un convenio de arbitraje; (2) si dicho convenio cubre la controversia particular planteada; y (3) si el convenio se extiende a una disputa sobre la duración o expiración del contrato. *Municipio Mayagüez v. Lebrón, supra*, págs. 720-721; *U.C.P.R. v. Triangle Engineering Corp.,* 136 DPR 133, 144 (1994).

Ahora bien, debido a que los convenios de arbitraje son contratos, el primer principio que subyace a todas nuestras decisiones sobre arbitraje es que el arbitraje es estrictamente una cuestión de consentimiento. En ese sentido las partes pueden establecer distintos acuerdos en lo relativo al arbitraje. Es decir, **pueden acordar someter el fondo de una controversia a un árbitro; y pueden pactar que sea un árbitro, en lugar de un tribunal, quien resuelva tanto las cuestiones umbrales de arbitrabilidad como las controversias de fondo.** *S.L.G Méndez-Acevedo v. Nieves Rivera, supra,* pág. 366. Por tanto, la pregunta de umbral que debe formularse en toda controversia relacionada con arbitraje debe ser: ¿a qué consintieron las partes?.

**D. La legislación federal y su jurisprudencia.**

Como ya indicáramos, en el ámbito federal, el arbitraje está regido por la FAA. Esta legislación establece un marco jurídico uniforme para la validez, exigibilidad y ejecución de los acuerdos de arbitraje en los Estados Unidos. Conforme a su Sección 2, un acuerdo escrito de arbitraje es válido, exigible e irrevocable, salvo por las causales de nulidad aplicables a cualquier contrato en derecho o en equidad.[18]

La jurisprudencia federal ha delineado los parámetros sobre quién decide la arbitrabilidad. Así, el Tribunal Supremo federal resolvió en *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995), que corresponde a los tribunales decidir si existe un acuerdo válido de arbitraje y si una disputa particular cae dentro de sus términos. A su vez, en *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 US 395 (1967), y más tarde en *Buckeye Check Cashing, Inc. v. Cardegna*, 546 US 440 (2006), se estableció la doctrina de separabilidad: una impugnación dirigida al contrato en su totalidad —como por alegaciones de fraude generalizado— corresponde al árbitro, mientras que una impugnación específica a la cláusula arbitral compete al tribunal.

Más adelante, en *Rent-A-Center, West, Inc. v. Jackson*, *supra*, el Supremo Federal resolvió que cuando las partes

---

[18] La sec. 2 del título 9 USCA sec. 2, dispone: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4".

acuerdan de manera clara e inequívoca delegar al árbitro la decisión sobre la validez, exigibilidad o aplicabilidad de la cláusula arbitral, el tribunal debe respetar esa delegación, salvo que una de las partes impugne específicamente la cláusula de delegación. Finalmente, en *Howsam v. Dean Witter Reynolds, Inc.*, 537 US 79 (2002), se aclaró que las cuestiones meramente procesales —como plazos, renuncias (*waiver*) o cumplimiento de condiciones internas del foro— son materia propia del árbitro, y no del tribunal.[19]

Recientemente, en *Coinbase, Inc. v. Suski*, 602 US 143 (2024), el Tribunal Supremo de los Estados Unidos reafirmó que la cláusula de arbitraje es un asunto contractual basado en la intención de las partes. Incluso, estas pueden formar múltiples niveles de acuerdos sobre arbitraje, a saber, pueden acordar enviar los méritos de una disputa a un árbitro (nivel básico), y también pueden acordar que un árbitro, en lugar de un tribunal, resolverá las cuestiones umbrales de arbitrabilidad, así como las disputas de méritos subyacentes.

Por otra parte, la American Arbitration Association (AAA), una de las principales instituciones que administran

---

[19] En Puerto Rico, la Ley Núm. 147-2024, *supra*, adopta este marco y lo armoniza con nuestra tradición jurídica. Su Art. 2.03(b) dispone que corresponde **al tribunal decidir si existe un acuerdo de arbitraje o si una controversia está sujeta a este, salvo que las partes acuerden lo contrario expresamente o al pactar contractualmente que el arbitraje será regido por una organización arbitral.** A su vez, el Art. 2.03(c) reconoce que corresponde al árbitro resolver las condiciones pactadas para activar el arbitraje. Esta normativa reafirma la política pública fuerte y constante a favor del arbitraje, tal como lo hemos sostenido en nuestra jurisprudencia. Véase *S.L.G. Méndez-Acevedo v. Nieves Nieves*, 195 DPR 138 (2016).

procesos arbitrales en el país, ha promulgado el Reglamento de Arbitraje Comercial ("Commercial Arbitration Rules"),[20] el cual regula el procedimiento arbitral cuando las partes acuerdan someter sus disputas a la AAA. En lo que atañe, este Reglamento establece los parámetros sobre la competencia del árbitro para decidir cuestiones relativas a la existencia, validez y alcance del acuerdo arbitral.[21]

Por último, destacamos, que en *S.L.G Méndez Acevedo v. Nieves Rivera*, *supra*, tuvimos la oportunidad de pronunciarnos, por primera vez de forma expresa, sobre la aplicabilidad de la doctrina de separabilidad en el contexto del arbitraje comercial, al amparo de la hoy derogada Ley de Arbitraje Comercial de 1951. En ese caso, resolvimos que, cuando un contrato **contiene una cláusula de arbitraje amplia, corresponde al árbitro —y no a los tribunales— dirimir una controversia en la que se impugna la validez o la existencia del contrato en su totalidad. Adoptamos así la doctrina de separabilidad, conforme a la cual las cláusulas de arbitraje**

---

[20] Reglas enmendadas y en vigor desde el 1 de septiembre de 2022.

[21] La Regla 7 (Jurisdiction) dispone:

(a)    The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim, without any need to refer such matters first to a court.

(b)    The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c)    A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award. Commercial Arbitration Rules, R-7, pp. 14-15.

**son independientes del contrato principal que las contiene, y pueden ser exigibles aun cuando se cuestione la validez general del acuerdo.**

Al hacerlo, nos acogimos a la distinción desarrollada por el Tribunal Supremo de los Estados Unidos en *Buckeye Check Cashing, Inc. v. Cardegna*, *supra*, entre las impugnaciones dirigidas específicamente contra la cláusula arbitral –que deben ser evaluadas por el tribunal– **y aquellas que atacan la validez del contrato como un todo, las cuales deben ser referidas al foro arbitral.** Esa determinación armoniza con la política pública sólida y reiterada de nuestra jurisdicción a favor del arbitraje como mecanismo válido, eficaz y preferente de solución de controversias, y reafirma que, una vez pactado válidamente, el convenio arbitral debe ser respetado y ejecutado según sus términos.

## III.

En su recurso de *certiorari*, Máximo Solar alegó que erró el Tribunal de Apelaciones al revocar el dictamen emitido por el Tribunal de Primera Instancia debido a que entre las partes existe un contrato válido y cuya cláusula de arbitraje no puede ser impugnada por una mera alegación de fraude. Por otra parte, la señora Sierra Lugo reiteró los argumentos esbozados en su oposición a la solicitud de desestimación, es decir, alegó que la cláusula de arbitraje no fue producto de una negociación y que la misma fue incluida en el contrato mediante fraude y engaño.

Como indicamos, en nuestro ordenamiento jurídico rige el principio de libertad contractual, por el cual las partes pueden hacer los acuerdos que crean por convenientes siempre que no contravengan la ley, la moral y el orden público.[22] En lo atinente a la controversia ante nos, reiteramos que en nuestra jurisdicción se reconoce que las partes pueden válidamente pactar una cláusula de arbitraje para que al amparo de dicho método se resuelvan las disputas, pretiriendo así el trámite en los tribunales.

En relación con los hechos del presente caso, surge que el 7 de septiembre de 2020, la señora Sierra Lugo suscribió un contrato para el arrendamiento con Sunrun de un sistema solar fotovoltaico para generar energía eléctrica con una o más baterías. Este sería instalado en su residencia por un "socio de instalación", en este caso, Máximo Solar.[23] Además, el referido contrato contenía una cláusula arbitral en su Sección G (11) la cual dispone, en lo pertinente, lo siguiente:

> **11. Resolución de disputas; Arbitraje; Renuncia a la demanda colectiva**
>
> […]
>
> b. <u>ARBITRAJE</u>. SI LAS PARTES NO PUEDEN RESOLVER LA DISPUTA DE MANERA INFORMAL, LA DISPUTA, **INCLUYENDO LA DETERMINACIÓN DEL ALCANCE O LA APLICABILIDAD DE ESTE ACUERDO DE ARBITRAJE, SE DETERMINARÁ MEDIANTE ARBITRAJE VINCULANTE ANTE UN ÁRBITRO.** […]

---

[22] En el presente caso, la recurrida no argumentó ninguno de estos principios, los cuales en el pasado hemos reconocido como frenos a la libertad de contratación privada. *Luan Invest. Corp. v. Rexach Const. Co*, 152 DPR 652, 659 (2000).

[23] Véase Cláusula E del contrato intitulado Diseño e Instalación. Apéndice del recurso, págs. 138-178.

EL ARBITRAJE IMPLICA QUE USTED RENUNCIA A SU DERECHO DE JUICIO POR JURADO Y QUE TODAS LAS DISPUTAS SERÁN DECIDIDAS POR UN ÁRBITRO. **ESTE ACUERDO PARA ARBITRAR LAS DISPUTAS ESTÁ REGIDO POR LA LEY FEDERAL DE ARBITRAJE (FEDERAL ARBITRATION ACT, "FAA"),** EL ARBITRAJE SERÁ ADMINISTRADO POR [Judicial Arbitration and Mediation Services, Inc.] JAMS[,] DE CONFORMIDAD CON SUS REGLAS Y PROCEDIMIENTOS DEL ARBITRAJE SIMPLIFICADO. EL ARBITRAJE ESTARÁ A CARGO DE LA OFICINA DE JMAS MÁS CERCANA AL HOGAR.

[…]

c. […]

d. […]

e. […]

f. […]. (Mayúsculas en el original y negrilla suplida).[24]

De una lectura de la cláusula arbitral, antes citada, se desprende el lenguaje expreso de la intención de utilizar el arbitraje como mecanismo para adjudicar las controversias que surgieran entre las partes en relación con el contrato principal de arrendamiento. **Entre esas controversias, se incluyó la determinación del alcance o la aplicabilidad de este acuerdo de arbitraje.**

En la Demanda presentada, la recurrida alegó unos hechos que, a su entender, evidencian un craso y patente incumplimiento contractual. Por lo cual, argumentó que "no quiere el Sistema Solar y desea y requiere de este Tribunal que ordene la resolución del Contrato y que las partes demandadas se lleven el equipo de su propiedad, el cual lleva más de un año sin funcionar. Además, la parte demandante requiere la devolución del dinero pagado hasta el presente".[25] Por otro lado, también alegó que su

---

[24] Véase, Apéndice del *Recurso de Certiorari Civil*, págs. 155-156.
[25] Íd., pág. 74, alegación 40 de la demanda.

consentimiento estuvo viciado porque, ante falsas representaciones y maquinaciones insidiosas, se le hizo creer que con quien estaba contratando era con el peticionario. Añadió que firmó el contrato electrónicamente, sin que se le proveyera la oportunidad de revisarlo ni leerlo.[26] Por lo cual, considera que **el contrato de arrendamiento objeto de la presente reclamación** es nulo.

Por lo anterior, surge que la señora Sierra Lugo **cuestionó en la Demanda la validez del contrato de arrendamiento.** Luego, en su oposición a la moción de desestimación y consignado el derecho aplicable a la controversia alegó que, la cláusula de arbitraje no era válida por haber sido negociada mediando fraude o engaño. Además, la recurrida reconoció en su escrito en oposición que, para dejar sin efecto una cláusula de selección de foro hay que atacar su validez "de **forma específica demostrando que ésta fue incluida en el contrato como resultado de fraude o engaño**".[27] No obstante, en este caso, no cumplió con dicho requisito.

En suma, de una lectura de las alegaciones de la Demanda, de los argumentos posteriores, y de los autos del caso, surge claramente que **la recurrida no incluyó una alegación específica dirigida a rebatir la presunción de**

---

[26] Del contrato de arrendamiento aquí en controversia surge que este fue redactado en el idioma español. Asimismo, avisa que "[a]ntes de dar inicio a cualquier tipo de Trabajo, usted tiene derecho a recibir una copia completa de este Contrato, firmado por usted y Sunrun". Véase, Apéndice del Recurso, pág.139.

[27] Subrayado y negrillas en el original. Véase, Apéndice del recurso a la pág.189.

**validez de la cláusula de selección de foro**.[28] Ni especificó o alegó cuáles fueron los actos fraudulentos con relación a la inclusión de dicha cláusula.[29] La Regla 7.2. de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, dispone que "todas las aseveraciones de fraude o error, las circunstancias que constituyen el fraude o error deberán exponerse detalladamente". Puntualizamos que las aseveraciones sobre fraude o error "se consideran materias especiales, las cuales deben exponerse detalladamente en las alegaciones". *Carpets & Rugs v. Tropical Reps*, 175 DPR 615, 641 (2009). Por lo tanto, erró el Tribunal de Apelaciones al considerar meramente "la alegación de fraude y engaño" sin realizar un análisis integral de las alegaciones de la demanda y el derecho aplicable a la controversia.[30]

Asimismo, resulta de particular importancia que el foro apelativo no tomó en consideración lo resuelto en *Bobé et al. v. UBS Financial Service*, *supra*. Allí, aclaramos que **corresponde al tribunal evaluar alegaciones de fraude o engaño cuando estas se dirigen específicamente a la cláusula de selección de foro o de arbitraje**, esto es, cuando se cuestiona la validez de la cláusula en sí por la forma en

---

[28] *Bobé et al. v. UBS Financial Service*, 198 DPR 6, 22-23 (2017)

[29] Véase nota al calce núm. 8.

[30] Al resolver una moción de desestimación, el tribunal debe aceptar como ciertas las alegaciones contenidas en la demanda y considerarlas de la forma más razonable a la parte demandante. "Sólo se darán como ciertos aquellos hechos correctamente alegados, sin considerar las alegaciones con contenido hipotético". Véase Comité Asesor Permanente de las Reglas de Procedimiento Civil, *Informe de Reglas de Procedimiento Civil*, Secretariado de la Conferencia Judicial y Notarial, Tribunal Supremo de Puerto Rico, marzo de 2008, pág. 134. Véase, además, *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, 174 DPR 409(2008); *García v. E.L.A.*, 163 DPR 800 (2005); *Continental Ins. Co. v. Isleta Marina*, 106 DPR 809 (1978).

que fue incorporada al contrato. No obstante, **también reconocimos que cuando las alegaciones de vicio del consentimiento no impugnan de manera específica la cláusula en controversia, sino que se dirigen al contrato en su totalidad, no procede que el foro judicial entre a evaluar el fondo de dichas alegaciones.** En el presente caso, aunque el contrato suscrito es uno de adhesión las alegaciones de fraude y engaño no cumplieron con el grado de especificidad que requiere el ordenamiento jurídico. Si bien la recurrida reconoció lo resuelto en *Bobé et al. v. UBS Financial Service*, *supra*, dejó de alegar específicamente el fraude en la incorporación de la cláusula de arbitraje al contrato de arrendamiento.

De lo antes expuesto, surge que las alegaciones sobre vicio en el consentimiento fueron dirigidas a impugnar la validez del contrato principal de arrendamiento. No fue hasta que el peticionario solicitó que la controversia sobre incumplimiento de dicho contrato fuese atendida ante un árbitro, que la recurrida alegó fraude en la inclusión de la cláusula de arbitraje, esto sin especificar en qué consistió.[31] En consecuencia, erró el Tribunal de Apelaciones al considerar una mera alegación de fraude y no tomar en

---

[31] El Tribunal Supremo ha mencionado que para que una demanda fundada en fraude se considere suficiente, los hechos que en ella se aleguen tienen que ser de tal naturaleza que, al tomarlos por ciertos, puedan justificar una sentencia condenatoria. *Martínez v. Jiménez et al.*, 21 DPR 209, 213 (1914). Simples conclusiones, conjeturas y suposiciones o sospechas no son por sí solas suficientes para sustanciar una alegación de fraude. Íd.

consideración la doctrina de separabilidad aplicable a la controversia.

De otra parte, es importante reiterar que el hecho de que el contrato de arrendamiento celebrado entre las partes fuese uno de adhesión, no significa que esté viciado de nulidad.[32] Incluso, el mero hecho de que una cláusula de selección de foro no sea negociada, no la convierte en inejecutable, porque simplemente no fue objeto de negociación.[33] Estos fueron los únicos criterios argumentados por la recurrida en el presente caso.

Por último, en el presente caso el Tribunal de Primera Instancia dictó Sentencia desestimando **con perjuicio** la demanda instada por la recurrida. Inconforme, la recurrida acudió al Tribunal de Apelaciones el cual, luego de analizada la controversia, revocó el dictamen desestimatorio. En este aspecto, conforme al mandato dispuesto en el Art. 3 de la Ley de Arbitraje Comercial de 1951, *supra*, y lo resuelto en *Smith v. Spizzirri, supra*, no erró el foro intermedio al

---

[32] Destacamos que, en el presente caso, la controversia a resolverse **no era la validez o posible violación al orden público en nuestra jurisdicción de las cláusulas de arbitraje en los contratos de arrendamiento de sistemas fotovoltaicos, donde el consumidor solo decide entre aceptar en su totalidad el contrato o retirarse del negocio. Tampoco la posible anulabilidad de aquella cláusula que excluye la jurisdicción de una agencia reglamentadora, en vista de que no se recurrió a estas**. Véase, Art. 1249 (g) del Código Civil de 2020, 31 LPRA sec. 9803.

En el caso de autos, estaba en controversia si procedía la celebración de una vista evidenciaria para dilucidar si el consentimiento de la recurrida estuvo viciado al momento de firmar el contrato de arrendamiento con Sunrun. Conforme a lo resuelto, estamos ante una cláusula de arbitraje amplia y mandataria en la que corresponde al árbitro dilucidar dicha controversia, acorde con el principio de separabilidad adoptado en nuestra jurisdicción.

[33] Véanse, *Carnival Cruise Lines, Inc. v. Shute*, 499 US 585 (1991); *Samalot-Martinez v. Norwegian Cruise Line Holdings, Ltd.*, 2024 WL 308234 (1er Cir).

revocar la sentencia desestimatoria. El dictamen que debió emitir el Tribunal de Primera Instancia, una vez concluyó que todas las controversias de la demanda eran arbitrables, era **la suspensión de los procedimientos y no una desestimación con perjuicio de la causa de acción.**[34]

En conclusión, procede modificar la Sentencia recurrida a los únicos fines de dejar sin efecto la celebración de la vista evidenciaria ordenada por el foro apelativo intermedio. En su defecto procede la suspensión de los procedimientos ante el foro primario hasta tanto se haya procedido al arbitraje de conformidad con el convenio y lo aquí dispuesto.

## IV

Por los fundamentos antes expuestos, modificamos el dictamen recurrido a los únicos fines de dejar sin efecto la celebración de la vista evidenciaria ordenada. En consecuencia, ordenamos la suspensión de los procedimientos ante el foro primario hasta tanto se cumpla con el procedimiento de arbitraje suscrito por las partes en el convenio y de conformidad con lo aquí dispuesto.

Se dictará sentencia en conformidad.

Camille Rivera Pérez
Jueza Asociada

---

[34] "Section 3 does exactly that. It overrides any discretion a district court might otherwise have had to dismiss a suit when the parties have agreed to arbitration.". *Smith v. Spizzirri, supra*, pág. 5.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Nancy Sierra Lugo<br><br>Recurrida<br><br>v.<br><br>Sunrun PR Operations, LLC; Máximo Solar Industries, Inc., Aseguradoras ABC, John Doe y Richard Roe<br><br>Peticionarios | CC-2024-0599 | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico a 10 de julio de 2026.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, modificamos el dictamen recurrido a los únicos fines de dejar sin efecto la celebración de la vista evidenciaria ordenada. En consecuencia, ordenamos la suspensión de los procedimientos ante el foro primario hasta tanto se cumpla con el procedimiento de arbitraje suscrito por las partes en el convenio y de conformidad con lo aquí dispuesto.

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal Supremo. La Jueza Presidenta Oronoz Rodríguez emite la siguiente expresión disidente:

Distinto a lo que contiende la mayoría, tenemos ante nuestra consideración una controversia sobre el perfeccionamiento de un contrato y, por consiguiente, la eficacia de una cláusula de arbitraje. La Sra. Nancy Sierra Lugo (señora Sierra Lugo) alega que esta cláusula se introdujo a su contrato de financiamiento de placas solares de manera unilateral y sin obtener su consentimiento. En particular, aduce que su consentimiento estuvo viciado y que la tramitación del contrato estuvo plagada de irregularidades que

redujeron su oportunidad de conocer la extensión del acuerdo. Alega que firmó el contrato de forma electrónica sin tener la oportunidad de leerlo y bajo la impresión de que contrataba con Máximo Solar Industries, Inc. (Máximo Solar) y no con Sunrun PR Operations (Sunrun). Asimismo, arguye que no fue hasta varios meses luego de que culminara la instalación de las placas solares que se le proveyó copia del contrato. Sin embargo, a pesar de que la señora Sierra Lugo levanta planteamientos serios sobre la posible nulidad de dicha cláusula arbitral, esta Curia limita la jurisdicción de los tribunales para dilucidar su validez. Por entender que procedía ordenar una vista evidenciaria para dirimir la eficacia del acuerdo objeto de la controversia, me veo obligada a disentir respetuosamente.

La mayoría razona que la señora Sierra Lugo formuló una alegación de nulidad general en cuanto al contrato y que, por virtud de la doctrina de separabilidad, procedía presentar alegaciones específicas sobre la cláusula arbitral. Empero, este proceder le impone requisitos adicionales a los exigidos por las Reglas de Procedimiento Civil, 32 LPRA Ap. V, en cuanto a las alegaciones de la demanda. La Regla 6.1 de Procedimiento Civil se limita a requerir una relación sucinta y sencilla de hechos demostrativos de que la parte tiene derecho a un remedio. Íd. La Opinión mayoritaria, no obstante, le exige a la señora Sierra Lugo una alegación específica de fraude en cuanto a la cláusula de arbitraje, previo a tener acceso a los tribunales, a pesar de que presentó varias alegaciones en su demanda a los fines de impugnar la manera en que se tramitó el contrato que contiene la cláusula arbitral.

Por otro lado, bien sabemos que el consentimiento es uno de los elementos esenciales para la configuración de un contrato, pues el contrato se define como un "acuerdo de voluntades por medio del cual los interesados se obligan". SLG Ortiz-Alvarado v. Great American, 182 DPR 48, 62 (2011). Cónsono con lo anterior, las partes pueden pactar las cláusulas que entiendan por conveniente siempre y cuando no sean contrarias a la ley, a la moral o al orden público. 31 LPRA sec. 9753. Conforme a la libertad contractual, las partes pueden acordar cláusulas de selección de foro para "establecer cuál será el foro donde se atenderán las disputas posibles que puedan surgir de la relación contractual entre las partes". Bobé

*et al*. v. UBS Financial Services, 198 DPR 6, 15-16, (2017).

En cuanto a la selección del arbitraje como un mecanismo alterno de resolución de conflictos, este Tribunal ha delimitado las instancias en las cuales le compete a los tribunales intervenir para evaluar un acuerdo arbitral, tal como: (1) la existencia de un convenio de arbitraje; (2) si el convenio de arbitraje alcanza determinada controversia, y (3) si el convenio de arbitraje cobija una disputa sobre la duración del contrato. Municipio Mayagüez v. Lebrón, 167 DPR 713, 720-721 (2006); U.C.P.R v. Triangle Engineering Corp., 136 DPR 133, 144 (1994); World Films, Inc., v. Paramount Pict. Corp., 125 DPR 352, 361 (1990). A modo que, "la determinación de si un acuerdo crea el deber de las partes de arbitrar una controversia en particular es tarea judicial". World Films, Inc. v. Paramount Pictures Corp., *supra*, pág. 361. En esa línea, la cláusula de arbitraje controvertida se pactó en un contrato de adhesión, lo cual resulta preocupante dado que pudieran surgir dudas sobre si las partes negociaron la selección de foro, según corresponde. Recordemos que el hecho que las partes acuerden voluntariamente someter sus controversias al arbitraje es un requisito indispensable para validar la selección de dicho foro como mecanismo alterno a los tribunales de justicia. Aponte Valentín v. Pfizer Pharm., LLC, 208 DPR 263, 293 (2021) (Expresión disidente de la Jueza Presidenta Oronoz Rodríguez); Aquino González v. A.E.E.L.A, 182 DPR 1, 20 (2011).[35]

Por último, huelga señalar que, en reiteradas ocasiones, esta Curia ha aplicado el principio de autorrestricción respecto a la revisión de laudos arbitrales, en ánimo de conceder amplia deferencia a las determinaciones del árbitro, aun cuando incurra en errores de hecho o derecho. C.O.P.R. v. S.P.U., 181 DPR 299, 369 (2011). Véase también Febus y otros v. MARPE Const. Corp., 135 DPR 206, 218 (1994); J.R.T. v. Cooperativa Cafeteros, 89 DPR 498, 503 (1963). Es bajo este contexto de revisión judicial limitada —y considerando las restricciones que implica— que debemos evaluar si procede referir la controversia al foro arbitral,

---

[35] Entiendo necesario distinguir lo expresado en mi expresión disidente en Aponte Valentín v. Pfizer Pharm., 208 DPR 263 (2021), del caso de autos, pues un acuerdo de arbitraje convenido de manera voluntaria y conforme a derecho es exigible. No obstante, en esta ocasión, justamente está en controversia si la Sra. Nancy Sierra Lugo pactó de manera voluntaria el acuerdo de arbitraje.

a pesar de que persisten interrogantes sobre la validez del contrato y la voluntariedad de las partes al firmarlo.

Una mayoría de mis compañeros y compañeras de estrado optó por aplicar de manera automática el precedente establecido en S.L.G. Méndez-Acevedo v. Nieves Rivera, 179 DPR 359 (2010), para validar la arbitrabilidad del acuerdo objeto de controversia. No estoy de acuerdo con este curso de acción, máxime cuando la controversia de autos envuelve asuntos de alto interés público y versa sobre un modelo de contratación que se ha proliferado en los últimos años a raíz de la inestabilidad del sistema eléctrico.[36] Reitero que aquí, precisamente, está en controversia la validez del contrato suscrito entre la señora Sierra Lugo y Sunrun y, por consiguiente, la validez de la referida cláusula de arbitraje. Correspondía, como mínimo, concederle a la señora Sierra Lugo la oportunidad de participar de una vista evidenciaria previo a referirla a arbitraje. Por entender que queda en disputa la eficacia de este acuerdo, disiento respetuosamente.

El Juez Asociado señor Estrella Martínez disiente con opinión escrita a la cual se une la Jueza Presidenta Oronoz Rodríguez. El Juez Asociado señor Colón Pérez disiente con opinión escrita.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

---

[36] Noticel, *Sobre 100 mil clientes tienen sistemas solares en Puerto Rico y en medición neta*, https://noticel.com/ultima-hora/20240218/sobre-110-mil-clientes-tienen-sistemas-solares-en-puerto-rico-y-en-medicion-neta/, (última visita: 13 de marzo de 2026).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Nancy Sierra Lugo<br><br>Recurrida<br><br><br>v.<br><br>Sunrun PR Operations, LLC;<br>Máximo Solar Industries,<br>Inc., Aseguradoras ABC, John<br>Doe y Richard Doe<br><br>Peticionarios | CC-2024-0599 | *Certiorari* |

Opinión disidente emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ, a la cual se une la Jueza Presidenta ORONOZ RODRÍGUEZ.

En San Juan, Puerto Rico, a 10 de julio de 2026.

Hay ocasiones en que los remedios pueden ser peor que la enfermedad. Nos encontramos ante una de esas situaciones. Hay ocasiones en que los remedios que provee el arbitraje no son aplicables para atender determinados males sociales o desigualdades. En el caso que nos ocupa, no debemos ignorar que existe una política pública más fuerte a favor de la protección de los consumidores y las partes económicamente inferiores en las relaciones contractuales.

Ante esa realidad, la validez de un acuerdo de arbitraje ante planteamientos de fraude, engaño o inducción a error, en este contexto, representa una controversia inseparable del cuestionamiento al consentimiento del

contrato en general. Resolverlo en primer orden es tarea inherentemente judicial.

Por considerar que el Tribunal de Apelaciones esencialmente delineó un curso de acción adecuado para atender las alegaciones legítimas respecto a la invalidez de una cláusula de arbitraje, incluida en un claro contrato de adhesión relacionado con un servicio esencial, respetuosamente disiento del resultado al que llega una mayoría de este Tribunal, así como las razones que lo fundamentan.

En adelante, trazo las razones de mi desavenencia, no sin antes destacar algunas de las incidencias procesales más importantes de este caso.

I

Este caso tiene su origen el 4 de diciembre de 2023 cuando la Sra. Nancy Sierra Lugo (señora Sierra Lugo o recurrida) presentó una *Demanda* en contra de Sunrun PR Operations, LLC (Sunrun) y Máximo Solar Industries, Inc. (Máximo Solar o parte peticionaria).[1] En ella, solicitó la resolución y nulidad de un contrato para el arrendamiento de un sistema solar fotovoltaico que firmó con Sunrun, la remoción del equipo instalado en su propiedad por las partes

---

[1] Entrada Núm. 1 del expediente digital del caso SJ2023CV11245 en el Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC-TPI).

demandadas, la devolución del dinero pagado hasta ese momento y la indemnización por daños contractuales.

En lo pertinente, aludió a que, <u>previo a la contratación</u>, Máximo Solar – vendedora y socia de instalación de Sunrun – le representó falsamente, en todo momento, que era la compañía que otorgaba el contrato.[2] En ese sentido, puntualizó que no fue hasta que recibió la copia del contrato, varios meses después de la instalación, que se enteró de que realmente había contratado con Sunrun. Además, agregó que el contrato fue firmado electrónicamente sin que se le proveyera la oportunidad de revisarlo y leerlo. En derecho, arguyó que esto último, sumado a que no se le brindó copia física del documento contractual, tornaba nulo el acuerdo y viciaba su consentimiento.

Luego de varias incidencias procesales, las cuales incluyeron la contestación de la *Demanda*[3], el 8 de marzo de 2024, Máximo Solar presentó una *Solicitud de desestimación* al amparo de la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, en la que adujo que el contrato suscrito entre la señora Sierra Lugo y Sunrun contenía una cláusula de arbitraje que abarcaba cualquier disputa contractual entre las partes y que, por eso, el tribunal carecía de jurisdicción sobre la controversia objeto de la reclamación.

---

[2] Véase la alegación núm. 8 de la *Demanda*, Entrada Núm. 1 del expediente digital del caso en el SUMAC-TPI.

[3] Véase Entrada Núm. 13 del expediente digital del caso en el SUMAC-TPI.

En particular, la parte peticionaria citó la sección G (11) del contrato, la cual preceptúa el procedimiento para resolver disputas al adoptar, primero, un proceso informal de resolución de disputas y luego el arbitraje.[4] Por último, argumentó que las alegaciones de fraude hechas por la recurrida iban dirigidas al contrato en general, no a la cláusula de arbitraje, y, por lo tanto, debían ser adjudicadas por un árbitro o árbitra.

El 18 de abril de 2024, la señora Sierra Lugo presentó una *Oposición a solicitud de desestimación* en la que expuso que la referida cláusula de arbitraje era inaplicable, pues

---

[4] Apéndice de la *Petición de Certiorari*, págs. 155-156. Junto a la moción, la parte peticionaria incluyó como anejo el contrato firmado entre las partes.

Cabe destacar que, según el texto de la cláusula, el arbitraje sería el único medio de resolución de controversias, a menos que una de las partes tuviera permitido presentar una reclamación ante un tribunal que atienda causas menores. En concreto, el contrato dispone:

> EL ARBITRAJE SERÁ EL ÚNICO MEDIO DE RESOLUCIÓN DE CONTROVERSIAS, **SALVO QUE UNA DE LAS PARTES TENGA PERMITIDO PRESENTAR UNA RECLAMACIÓN ANTE UN TRIBUNAL QUE ENTIENDE EN CAUSAS MENORES (EN TANTO Y EN CUANTO El MONTO CONTROVERTIDO SEA MENOR QUE EL LÍMITE DE RECLAMACIÓN PARA ESE TRIBUNAL) EN LUGAR DE SOMETERSE A ARBITRAJE,** SIEMPRE QUE ESE TRIBUNAL TENGA COMPETENCIA SOBRE LA CONTROVERSIA, Y LA CONTROVERSIA SEA EXCLUSIVAMENTE EN SU NOMBRE Y NO EN NOMBRE DE OTRA PERSONA. (Ennegrecido nuestro). Apéndice de la *Petición de Certiorari*, pág. 155.

Igualmente, se establece que el árbitro o la árbitra podrá asignar la totalidad o parte de los costos del arbitraje, incluidos los honorarios del árbitro o la árbitra y los honorarios razonables de la parte vencedora. Íd., págs. 155-156.

fue incluida como resultado de fraude y engaño.[5] Asimismo, sumó que el contrato debía ser analizado como uno de adhesión.

El 15 de mayo de 2024, el Tribunal de Primera Instancia emitió una *Sentencia* en la que desestimó el pleito en su totalidad.[6] A su juicio, no estaba en controversia la existencia del acuerdo de arbitraje, toda vez que la señora Sierra Lugo no realizó alegaciones específicas sobre la naturaleza engañosa o fraudulenta de su inclusión, como exige la Regla 7.2 de Procedimiento Civil, 32 LPRA Ap. V. Por ello, concluyó que no poseía jurisdicción para atender la reclamación.

Inconforme, la señora Sierra Lugo acudió al Tribunal de Apelaciones. Este, por su parte, revocó la determinación del foro primario y devolvió el caso para la celebración de una vista evidenciaria con el singular fin de evaluar la validez de la cláusula de arbitraje contenida en el contrato. En concreto, razonó:

> Por tanto, ante la alegación de fraude y engaño en torno a la cláusula de arbitraje y la posibilidad de que esta sea nula e ineficaz, el [Tribunal de Primera Instancia] debió examinar la invalidez de la cláusula de selección de foro luego de una vista evidenciaria. A tales efectos, el foro primario debió celebrar una vista evidenciaria para evaluar la validez de la cláusula de selección de foro.

---

[5] Entrada Núm. 25 del expediente digital del caso en el SUMAC-TPI.

[6] Entrada Núm. 27 del expediente digital del caso en el SUMAC-TPI. Procesalmente, el foro primario acogió la moción de desestimación de Máximo Solar como una solicitud de sentencia sumaria.

> Celebrada la vista evidenciaria, el [Tribunal de Primera Instancia] podrá dirimir la obligación de arbitrar y declararse sin jurisdicción, de ser necesario, pero si declara que la cláusula de arbitraje es ineficaz para atender la controversia, se debe continuar el caso.[7]

Esa conclusión la conjugó, a su vez, con el estándar de adjudicación aplicable ante una solicitud de desestimación bajo la Regla 10.2 de Procedimiento Civil, *supra*.

En desacuerdo, Máximo Solar presentó la petición de *certiorari* que nos ocupa. En esencia, reiteró sus planteamientos. Así, argumentó que era aplicable el principio de separabilidad adoptado en nuestra jurisdicción en *S.L.G. Méndez-Acevedo v. Nieves Rivera*, 179 DPR 359 (2010), dado que la señora Sierra Lugo no alegó específicamente cómo se cometió fraude o engaño al incluirse esa disposición en el acuerdo y se limitó a atacar la validez del contrato en términos generales. Por último, planteó que acudir al foro arbitral no representa un acto oneroso ni dificulta el acceso a la justicia, especialmente ante la adopción reciente de servicios de resolución de disputa de forma virtual o híbrida.

Por su parte, la señora Sierra Lugo defendió la determinación del Tribunal de Apelaciones. Es su posición que, desde un inicio, cuestionó directamente la validez de la cláusula de arbitraje porque en sus comparecencias alegó que esta fue incluida en el contrato como resultado de fraude y engaño y no fue producto de negociación. Igualmente,

---

[7] Íd., pág. 12.

recalcó que también adujo que, durante la contratación, Máximo Solar le representó que era la compañía con la que se estaba contratando, fue la única entidad con la que se comunicó la recurrida y no le proveyó a esta una copia física del contrato. Todo ello, plasmó, debía ser adjudicado por el tribunal en una vista evidenciaria en la que escuchara a las partes. De igual forma, según sostuvo, se debió: (1) auscultar si el contrato, por ser de adhesión, contenía cláusulas ambiguas que favorecían a la parte que las redactó; y (2) considerar que al implementarse la cláusula de arbitraje se provocaría una clara y patente inequidad.

Contando con este recuento, procedo a exponer los fundamentos en derecho que sustentan mi discrepancia con la postura asumida por una mayoría de este Tribunal.

II

A.

La moción de desestimación presentada al amparo de la Regla 10.2 de Procedimiento Civil, *supra*, es la que promueve una parte demandada previo a contestar la demanda para que esta se desestime. *Accurate Sols. v. Heritage Environmental*, 193 DPR 423, 432 (2015); *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, 174 DPR 409, 428 (2008); véase R. Hernández Colón, *Práctica jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta ed., San Juan, LexisNexis, 2017, pág. 305. Esta acción procede cuando de las alegaciones de la demanda surge evidentemente que alguna defensa afirmativa derrotará la pretensión de la parte demandante. *Díaz Vázquez et al. v.*

*Colón Peña et al.,* 214 DPR 1135 (2024), citando a *Eagle Security v. Efrón Dorado et al.,* 211 DPR 70, 83 (2023); *Casillas Carrasquillo v. ELA*, 209 DPR 240, 247 (2022). Por tanto, la solicitud de desestimación puede basarse en varios fundamentos, entre los que se destacan por su pertinencia a la controversia de autos: la falta de jurisdicción sobre la persona y el dejar de exponer una reclamación que justifique la concesión de un remedio.

Por un lado, la jurisdicción se entiende como el poder de un tribunal para considerar y decidir los casos y las controversias que se presentan ante él. *Pueblo v. Torres Medina*, 211 DPR 950, 958 (2023). Esto motiva la norma reiterada de que los tribunales debemos ser celosos guardianes de nuestra jurisdicción y, por ello, los asuntos relacionados a ella son privilegiados, deben atenderse de forma preferente y pueden plantearse *motu proprio* por el tribunal. *Mun. Río Grande v. Adq. Finca et al.,* 2025 TSPR 36, 215 DPR ___ (2025); *Mun. de San Sebastián v. QMC Telecom*, 190 DPR 652, 660 (2014). Por todo eso, si un tribunal no tiene jurisdicción, solo tiene autoridad para así declararlo y desestimar la reclamación sin entrar en los méritos. Íd.

Propiamente, la jurisdicción sobre la persona se trata del poder del tribunal para sujetar a una parte a su decisión o, es decir, emitir una decisión obligatoria para esta. (Citas omitidas). *Trans-Oceanic Life Ins. v. Oracle Corp.,* 184 DPR 689, 701 (2012). Distinto a la jurisdicción sobre la materia – la cual las partes no pueden otorgar ni privarle

a un tribunal – la jurisdicción sobre la persona es un derecho individual y renunciable. *Unisys v. Ramallo Brothers*, 128 DPR 842, 862 esc. 5 (1991).[8]

En el pasado, hemos resuelto que, enfrentado a una moción de desestimación al amparo de la Regla 10.2 de Procedimiento Civil, *supra*, bajo el fundamento de falta de jurisdicción sobre la persona, un tribunal tiene gran discreción para escoger cómo proceder entre: (1) evaluar la solicitud según las alegaciones de la demanda únicamente; (2) analizar conjuntamente los documentos o declaraciones juradas incluidas en apoyo de la moción junto con las alegaciones y los documentos o las contradeclaraciones juradas que acompañe la parte demandante en su oposición; (3) señalar una vista preliminar evidenciaria; o (4) posponer la cuestión para decidirla después de la vista en su fondo para resolver el caso. *Trans-Oceanic Life Ins. v. Oracle Corp., supra*, págs. 705-706; *Molina v. Supermercado Amigo, Inc.*, 119 DPR 330, 338 (1987).

Del tribunal optar por la primera opción, deberá dar por ciertos los hechos bien alegados por las partes y descartar las conclusiones de derecho. *Molina v. Supermercado Amigo, Inc., supra*, pág. 338. Si se escoge la

---

[8] Similarmente, también hemos expresado que las cláusulas de selección de foro no afectan la jurisdicción del tribunal sobre la materia, sino la jurisdicción sobre la persona. *H.R., Inc. v. Vissepó & Diez Constr.*, 190 DPR 597, 606, esc. 16 (2014). Por ejemplo, mediante una cláusula de arbitraje, las partes acuerdan voluntariamente limitar la jurisdicción de los tribunales sobre su persona para, en su lugar, dar paso al arbitraje. *Íd.*, pág. 606.

segunda opción, será necesario que la parte demandante presente documentos o contradeclaraciones juradas que demuestren que hay jurisdicción sobre la persona. *Trans-Oceanic Life Ins. v. Oracle Corp., supra*, pág. 706; *Molina v. Supermercado Amigo, Inc., supra*, pág. 339. Similarmente, si el tribunal decide celebrar la vista evidenciaria, la parte demandante estará obligada a establecer mediante preponderancia de la prueba que existe jurisdicción sobre la persona. *Molina v. Supermercado Amigo, Inc., supra*, pág. 340.

En relación con este último curso de acción, también precisamos, en el contexto de la presunta falta de jurisdicción sobre una parte no domiciliada, que, en la etapa inicial de un caso, para dilucidar la cuestión de jurisdicción sobre la persona, **se puede solicitar el descubrimiento de prueba limitado a la controversia jurisdiccional**. Íd., pág. 341. También, destacamos que "[c]uando la determinación jurisdiccional pueda disponer de todo o parte del caso, es aconsejable la celebración, lo antes posible, de la vista evidenciaria […]". Íd.

Por otro lado, cuando se fundamenta una moción de desestimación bajo la defensa de dejar de exponer una reclamación que justifique la concesión de un remedio, nuestros lineamientos jurisprudenciales establecen que el tribunal deberá, al resolverla, tomar como ciertos todos los hechos bien alegados en la demanda y que hayan sido aseverados de manera clara y concluyente. *Casillas*

*Carrasquillo v. ELA*, *supra*, pág. 247; *González Méndez v. Acción Social et al.*, 196 DPR 213, 234 (2016). En esa tarea, el tribunal está llamado a interpretar las alegaciones de forma conjunta y liberal, así como de la manera más favorable a la parte demandante. *Casillas Carrasquillo v. ELA*, *supra*; *González Méndez v. Acción Social et al.*, *supra*.

Así, la encomienda implica razonar si, a la luz de la situación más favorable a la parte demandante y resolviendo toda duda a su favor, la demanda es suficiente para constituir una reclamación válida. (Citas omitidas). *Casillas Carrasquillo v. ELA*, *supra*; *González Méndez v. Acción Social et al.*, *supra*, pág. 235. A tales efectos, la demanda no deberá desestimarse a menos que se demuestre que la parte demandante carece de derecho a remedio alguno, bajo cualquier hecho que pueda probar. *Casillas Carrasquillo v. ELA*, *supra*; *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, *supra*, pág. 429. Por ello, como norma general, se debe conceder la desestimación cuando existan circunstancias que permiten al tribunal determinar, sin ambages, que la demanda carece de todo mérito y que la parte demandante no tiene derecho a algún remedio. *González Méndez v. Acción Social et al.*, *supra*, pág. 235.

Sin embargo, debe advertirse que la desestimación bajo este fundamento se enmarca en que la privación a un litigante de su día en corte es una medida procedente solo en casos extremos y claros. *Costas Elena y otro v. Magic Sport y otros*, 213 DPR 523, 534 (2024); *Rosario v. Nationwide Mutual*,

158 DPR 775, 780 (2003). Esto, en vista de las posibles implicaciones que tiene tal medida sobre el debido proceso de ley. *Rosario v. Nationwide Mutual*, *supra*, pág. 780, citando a *Roig Com. Bank v. Rosario Cirino*, 126 DPR 613, 617 (1990).

Además, hemos reconocido que cuando "esté involucrado un alto interés público no debe desestimarse ninguna acción mediante este mecanismo procesal, salvo en aquellas ocasiones en que no quepa duda que bajo ninguna situación de hecho que surja lógicamente de la demanda es posible conceder un remedio adecuado, cualquiera que éste sea". *Aut. Tierras v. Moreno & Ruiz Dev. Corp.*, *supra*, pág. 429.

Cabe destacar que la atención de este tipo de moción debe considerar que, por virtud de la Regla 6.1 de Procedimiento Civil, *supra*, la demanda únicamente tiene que contener "una relación sucinta y sencilla de los hechos demostrativos de que la parte peticionaria tiene derecho a un remedio". Esto, pues, el singular propósito de las alegaciones es notificar, a grandes rasgos, las reclamaciones en contra de la parte demandada para que esta pueda comparecer a defenderse. *Sánchez v. Aut. de los Puertos*, 153 DPR 559, 569-570 (2001).

Por último en este respecto, según la Regla 10.2 de Procedimiento Civil, *supra*, cuando se fundamenta una solicitud de desestimación a su amparo bajo el fundamento de dejar de exponer una reclamación que justifique la concesión de un remedio y, a la misma vez, se exponen materias no

contenidas en la alegación impugnada y estas no son excluidas por el tribunal, entonces la moción debe ser considerada propiamente como una solicitud de sentencia sumaria y, por ende, deberá estar sujeta a todos los trámites requeridos por la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, hasta su resolución final. Véanse *Bonnelly Sagrado et al. v. United Surety*, 207 DPR 715, 722-723 (2021) y *Sifontes v. Oliver Exterminating Services Corp.*, 128 DPR 207 (1991).

En ese contexto, hemos reiterado que esta conversión tiene lugar cuando una parte somete materias que no formaron parte de las alegaciones, tales como: deposiciones, admisiones, certificaciones y contestaciones a interrogatorios. *Torres Capeles v. Rivera Alejandro*, 143 DPR 300, 309 (1997). Cuando se presentan este tipo de materias, el tribunal tiene plena discreción para aceptarlas. Íd. En el ejercicio de esta, el foro primario puede denegar tanto la conversión a una moción de sentencia sumaria como la desestimación, "si de la materia ofrecida surge que el caso no se debería despachar sumariamente y que para su resolución se debería celebrar una vista en su fondo." Íd.

## B.

Sabido es que en nuestra jurisdicción existe una importante política pública que favorece el arbitraje como método alterno para solucionar disputas. *Landrau Cabezudo et al. v. Puertos et al.*, 2025 TSPR 7, 215 DPR ____ (2025); *Aponte Valentín et al. v. Pfizer Pharm*, 208 DPR 263, 282 (2021). Ello responde al interés del Estado en facilitar

vías rápidas, flexibles y menos onerosas que los tribunales para resolver controversias entre partes. *Landrau Cabezudo et al. v. Puertos et al.*, *supra*; *H.R., Inc. v. Vissepó & Diez Constr.*, 190 DPR 597, 605 (2014).

Con arreglo a ello, mediante el arbitraje, aquellas partes que **válida y voluntariamente lo hayan pactado** sustituyen a los tribunales por un árbitro o árbitra para que este o esta determine todas las controversias de hecho y de derecho que surjan entre ellas. *Landrau Cabezudo et al. v. Puertos et al.*, *supra*; *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 368. Por esta razón, aunque se fomenta el arbitraje, su uso solamente corresponderá **cuando las partes así lo pacten**. *Aponte Valentín et al. v. Pfizer Pharm*, *supra*, págs. 282-283; *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*.

En este sentido, cabe subrayar el principio reiterado de que el arbitraje es una figura inherentemente contractual y, por ello, no se puede obligar a una parte a someter una disputa al procedimiento de arbitraje, a menos que se haya pactado de esa forma. *Kendall Hope Tucker v. Money Group, LLC y otros*, 2026 TSPR 9, 217 DPR ___ (2026); *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 367.

Por este motivo, una de las controversias que con frecuencia se suscita es si las partes están obligadas a arbitrar y la tarea de descifrarlo recae inherentemente en

los tribunales.[9] *Kendall Hope Tucker v. Money Group, LLC y otros*, *supra*; *Aponte Valentín et al. v. Pfizer Pharm*, *supra*, pág. 283; *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 367; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 US 440, 444-445 (2006).

En torno a esta primordial tarea judicial, hemos pautado que los tribunales deben auscultar: (1) si existe un convenio de arbitraje; (2) si ese convenio alcanza determinada controversia; y (3) si el convenio alcanza una disputa sobre la duración o expiración del contrato. *Aponte Valentín et al. v. Pfizer Pharm*, *supra*, pág. 283; *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, pág. 367. Esta tarea tampoco puede divorciarse de las razones que, anteriormente, hemos esgrimido para determinar la no aplicabilidad de una cláusula de selección de foro, tales como: (1) que el foro seleccionado sea **irrazonable e injusto**; (2) que de ventilarse el caso en tal foro se incurriría en una **clara y**

---

[9] Al cumplir esa función, hemos reconocido contadas, pero importantes, excepciones a la obligatoriedad del arbitraje, principalmente en el contexto de las relaciones obrero-patronales y leyes protectoras. *Quiñones v. Asociación*, 161 DPR 668, 673-674 (2004). En el pasado, he sido enfático sobre la necesidad de garantizar el acceso a los remedios establecidos por nuestros estatutos de protección a la ciudadanía, especialmente en el ámbito laboral, frente a las cláusulas de arbitraje. Véanse *Aponte Valentín et al. v. Pfizer Pharm*, 208 DPR 263 (2021) (Opinión disidente del Juez Asociado señor Estrella Martínez); *Méndez Jiménez v. Carso Const.*, 202 DPR 554 (2019) (Sentencia) (Opinión disidente del Juez Asociado señor Estrella Martínez). Recientemente, renové ese llamado en el ámbito de los contratos individuales de empleo, los cuales en su mayoría son de adhesión. *Kendall Hope Tucker v. Money Group, LLC y otros*, 2026 TSPR 9, 217 DPR ___ (2026) (Opinión disidente del Juez Asociado señor Estrella Martínez).

**patente inequidad** o sería irrazonable e injusto; (3) que la cláusula no es válida porque **fue negociada mediando fraude o engaño**; y (4) que la implantación de la cláusula derrotaría la política pública del Estado. *Unisys v. Ramallo Brothers*, 128 DPR 842, 857 (1991). Y es que, incluso, hemos conjugado las cláusulas de arbitraje en el mismo plano que las de selección de foro. *Bobé et al. v. UBS Financial Service*, 198 DPR 6, 17-18 (2017).

No obstante, esta tarea no es impuesta exclusivamente por la jurisprudencia, sino que es delegada a los tribunales por los estatutos federales y locales que favorecen el arbitraje. A nivel federal, la *Federal Arbitration Act* (FAA), 9 USCA sec. 1 *et seq.*, mandata a los tribunales a reconocer como válidas, irrevocables y ejecutables las disposiciones contractuales a favor del arbitraje, "save upon such grounds as exist at law or in equity for the revocation of any contract". 9 USCA sec. 2. Entretanto, a nivel local, la *Ley de Arbitraje Comercial en Puerto Rico*, Ley Núm. 376 de 8 de mayo de 1951, 32 LPRA ant. sec. 3201 *et seq.* (derogada) (Ley de Arbitraje Comercial de 1951), en su Artículo 1, disponía que todo convenio de arbitraje sería válido, exigible e irrevocable "salvo por los fundamentos que existieran en derecho para la revocación de cualquier convenio". 32 LPRA ant. sec. 3201.[10] Asimismo, por virtud

---

[10] La Ley de Arbitraje de 1951, *supra*, era el estatuto vigente al momento de los hechos del caso y, por ello, se cita, pese a ser derogada por la *Ley de arbitraje de Puerto*

estatutaria, las controversias sobre la existencia o validez de un contrato de arbitraje deberán ser resueltas por los tribunales. Art. 4 de la Ley de Arbitraje Comercial de 1951, 32 LPRA ant. sec. 3204.

Así, enfrentado a este tipo de controversia a la luz de la FAA, el más alto foro federal, al igual que los tribunales inferiores, ha resuelto que los tribunales pueden invalidar un acuerdo de arbitraje **conforme a las mismas defensas que aplican a todo contrato**. *Gaines v. AT&T Mobility Servs., LLC*, 424 F.Supp.3d 1004 (S.D. Cal. 2019); *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889 (9no Cir. 2002); *Doctor's Associates, Inc. v. Casarotto*, 517 US 681, 687 (1996); *Allied-Bruce Terminix Cos. v. Dobson*, 513 US 265, 281 (1995). Incluso, las expresiones del Tribunal Supremo federal permiten examinar la validez de acuerdos de arbitraje ante defensas aplicables al contrato en general. *Doctor's Associates, Inc. v. Casarotto*, *supra*, págs. 686-687; *Perry v. Thomas*, 482 US 483 (1987). Lo importante es que no se invaliden los acuerdos mediante leyes o normas estatales aplicables únicamente a acuerdos de arbitraje. *Doctor's Associates, Inc. v. Casarotto*, *supra*. En concreto, el más alto foro federal expresó:

> Repeating our observation in *Perry,* the text of §2 [of the FAA] declares that state law may be applied "*if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." Thus, **generally applicable contract defenses, such as**

---

*Rico*, Ley Núm. 147 de 9 de agosto de 2024, 32 LPRA sec. 3230 *et seq*.

**fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening §2.**

[…]

Courts may not, however, invalidate arbitration agreements under state laws applicable *only* to arbitration provisions. (Ennegrecido nuestro) (Citas omitidas). Íd., págs. 686-687.

De esta forma, se ha reconocido la facultad del tribunal para acudir a normas del derecho contractual para determinar si existe un acuerdo de arbitraje válido al amparo del estatuto federal. *Perry v. Thomas*, *supra*, pág. 490. Así también lo hemos hecho en Puerto Rico. Véanse, entre otros, *Kendall Hope Tucker v. Money Group, LLC y otros*, *supra*; *Aponte Valentín et al. v. Pfizer Pharm*, *supra*; *H.R., Inc. v. Vissepó & Diez Constr.*, *supra*; *Constructora Estelar v. Aut. Edif. Púb.*, 183 DPR 1 (2011); *Aquino González v. A.E.E.L.A.*, 182 DPR 1 (2011); *VDE Corporation v. F&R Contractors*, 180 DPR 21, 33 (2010); *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*.

C.

Entre las normas del derecho contractual a las que debemos acudir los tribunales se encuentra la más fundamental de ellas: un contrato es perfeccionado cuando concurren los elementos de la causa de la obligación que se establezca, el objeto cierto que sea materia del contrato y el consentimiento de las partes contratantes. Art. 1213 del

Código Civil de 1930, 31 LPRA ant. sec. 3391.[11] De concurrir las condiciones esenciales para su validez, un contrato es obligatorio sin importar la forma en que se haya celebrado. Art. 1230 del Código Civil de 1930, 31 LPRA ant. sec. 3451. Fundamentalmente, los contratos se perfeccionan por el mero consentimiento y obligan a las partes desde que consienten tanto al cumplimiento de lo expresamente pactado como a todas las consecuencias que sean conformes a la buena fe, el uso y la ley. Art. 1210 del Código Civil de 1930, 31 LPRA ant. sec. 3375.

Por su pertinencia, corresponde destacar el elemento del *consentimiento*, el cual se manifiesta por el concurso de la oferta y de la aceptación de la cosa y la causa que constituyen el contrato. Art. 1214 del Código Civil de 1930, 31 LPRA ant. sec. 3401. Respecto a este, el profesor José Vélez Torres expuso que "[l]a prestación del consentimiento para que sea considerada válida, presume una voluntad capaz que sea, además, libre y **que tenga completo conocimiento sobre lo que está haciendo**; es decir, una voluntad que actúa libre y espontáneamente". (Ennegrecido nuestro). J.R. Vélez Torres, *Curso de derecho civil: derecho de contratos*, San Juan, Facultad de Derecho de la Universidad Interamericana, 1990, T. V, Vol. II, pág. 45.

---

[11] Aunque la Ley Núm. 55-2020 derogó el Código Civil de 1930, se cita este último por ser el estatuto vigente al momento de firmarse el contrato.

En la misma línea, hemos expresado que "para que se entienda prestado el consentimiento a un negocio jurídico, ya [sea] expresa o implícitamente, es necesario que el declarante **tenga conocimiento adecuado del alcance de su declaración**". (Ennegrecido nuestro). *Colón Gutiérrez v. Registrador*, 114 DPR 850, 863 (1983); véanse también Federico De Castro y Bravo, *El Negocio Jurídico*, Madrid, Gráficas Marisal, 1971, pág. 58 y J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 77. En pocas palabras, el ejercicio válido de una facultad requiere el previo conocimiento de su plenitud. *Colón Gutiérrez v. Registrador*, *supra*.

Con ese mismo enfoque, citamos favorablemente a Lete del Río y Lete Achirica en cuanto a que el consentimiento "debe haberse formado [...] libre, consciente y deliberadamente; en caso contrario, se dice que está viciado, lo que da lugar a la anulabilidad del negocio". *S.L.G. Ortiz-Alvarado v. Great American*, 182 DPR 48, 62 (2011), citando a J.M. Lete del Río y J. Lete Achirica, *Derecho de Obligaciones*, Navarra, Ed. Thomson/Aranzadi, 2005, Vol. 1, págs. 430-431.

Por todo ello, tan requerido es el consentimiento de las partes para la validez de un contrato que, de este verse afectado, podría ocasionar la nulidad del negocio jurídico. *S.L.G. Ortiz-Alvarado v. Great American*, *supra*, págs. 62-63; *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 885-886

(2008); *Pérez Rosa v. Morales Rosado*, 172 DPR 216, 228-229 (2007); *Bosques v. Echevarría*, 162 DPR 830, 836 (2004). Entre las causas que pueden viciar el consentimiento prestado, se reconocen el error, la violencia, la intimidación y el dolo. *Bosques v. Echevarría*, *supra*, pág. 836; *Colón v. Promo Motor Imports, Inc.*, 144 DPR 659 (1997).

Este último, el dolo, existe cuando con el uso de "palabras o maquinaciones insidiosas de parte de uno de los contratantes, es inducido el otro a celebrar un contrato que, sin ellas, no hubiera hecho". Art. 1221 del Código Civil de 1930, 31 LPRA ant. sec. 3408. Acerca de los tipos de dolo, el que conlleva la nulidad de los contratos es el grave, siempre que no haya sido empleado por las dos partes contratantes. Art. 1222 del Código Civil de 1930, 31 ant. sec. 3409. Entretanto, el dolo incidental solo obliga al que lo llevó a cabo a indemnizar daños y perjuicios. Íd.

Al respecto, hemos reconocido que el dolo se trata de "todo un complejo de malas artes, contrario a las leyes de la honestidad e idóneo para sorprender la buena fe ajena, generalmente en propio beneficio". *S.L.G. Ortiz-Alvarado v. Great American*, *supra*, pág. 63, citando a L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, 6ta ed., Navarra, Ed. Thomson/Aranzadi, 2007, Vol. I, pág. 170. En ese sentido, también hemos favorecido que el dolo implica cualquier clase de comportamiento, ya sea por comisión u omisión, y abarca cualquier conducta como "astucias, argucias, mentiras, sugestiones, [y] artificios; consisten

en la invención de hechos falsos, en la ocultación de los existentes, o en suministrar referencias incompletas de éstos, etc.". Íd., págs. 64-65, citando a M. Albaladejo García, *Derecho Civil: introducción y parte general*, 17ma ed., Madrid, Ed. Edifoser, 2006, T. I, págs. 607-608.

Además, hemos sido claros en que **callar sobre una circunstancia importante respecto al objeto del contrato** constituye dolo. *S.L.G. Ortiz-Alvarado v. Great American*, *supra*, pág. 66; *Bosques v. Echevarría*, *supra*, pág. 836; *Márquez v. Torres Campos*, 111 DPR 854 (1982). Por consiguiente, no siempre es necesaria una acción afirmativa para que se incurra en dolo. *S.L.G. Ortiz-Alvarado v. Great American*, *supra*, pág. 66.

Por otra parte, otra de las causas que podría viciar el consentimiento de una parte contratante es que se viole el principio de la buena fe. *S.L.G. Silva-Alicea v. Boquerón Resort*, 186 DPR 532, 548 (2012). La buena fe significa que las partes están obligadas a actuar honrada y lealmente e implica guardar fidelidad a la palabra dada y **no defraudar la confianza ni abusar de ella** para que la negociación refleje una voluntad que no sea producto de la malicia o el engaño. Íd., pág. 547, citando a L. Díez-Picazo, *La doctrina de los propios actos*, Barcelona, Ed. Bosch, 1963, pág. 157. En efecto, esta permea en todo el proceso de contratación; esto es, desde las fases iniciales y preparatorias hasta la negociación del contrato y su cumplimiento. Íd., págs. 547-548.

Así, una posible violación a la buena fe incluye "**no revelar hechos importantes durante un proceso de negociación que muy bien pudieron conllevar a una contratación que de otra forma no hubiese tenido lugar**. En estos casos, el principio de buena fe se invoca porque la oferta o publicidad no responde a las exigencias de lealtad y honestidad". (Ennegrecido nuestro). Íd., pág. 548; M.J. Godreau Robles, *Lealtad y buena fe contractual*, 58 (Núm. 3) Rev. Jur. U.P.R. 367, 419-420 (1989). Sin embargo, no toda omisión conlleva la nulidad, pues se requiere que la falta de información sobre un hecho recaiga sobre elementos esenciales del contrato que, de conocerse, hubiese evitado que la otra parte prestara su consentimiento. *S.L.G. Silva-Alicea v. Boquerón Resort*, *supra*, pág. 548. Por último, no debe olvidarse que la buena fe cobra todavía más importancia – y utilidad – ante el fenómeno de los contratos de adhesión. Godreau Robles, *op. cit.*, pág. 418.

De igual manera, nuestro ordenamiento contractual se enmarca en el principio de la autonomía contractual o la libertad de contratación, de forma que se permite que las partes establezcan los pactos, las cláusulas y las condiciones que estimen convenientes, **siempre que no sean contrarias a la ley, la moral y el orden público**. *Demeter Int'l v. Srio. Hacienda*, 199 DPR 706, 727 (2018); Art. 1207 del Código Civil de 1930, 31 LPRA ant. sec. 3372. Sobre este último, el "orden público, lo hemos definido como el medio para lograr un balance entre la autonomía de la voluntad y

la protección del bienestar común". *Demeter Int'l v. Srio. Hacienda*, *supra*, pág. 728, citando a *De Jesús González v. A.C.*, 148 DPR 255, 266 (1999). De esta manera, este Tribunal se ha posicionado en contra de auxiliar a aquella parte que incurra en conducta contraria a la ley, la moral y el orden público. Íd. Por eso, se ha empleado la doctrina del orden público para declarar nulas aquellas cláusulas que atenten crasamente contra el buen orden del sistema jurídico, tales como las de contratos de carácter leonino o que le otorgan a una de las partes una ventaja injustificada. Íd.; *De Jesús González v. A.C.*, *supra*, pág. 267.

En último término, tampoco podemos dejar a un lado nuestra jurisprudencia concerniente a los contratos de adhesión. Estos comprenden aquellos acuerdos en los que una de las partes no interviene en su redacción y en los que el desequilibrio de poder entre estas impide un verdadero proceso previo de negociación. *Suárez Figueroa v. Sabanera Real, Inc.*, 173 DPR 694, 711 (2008). En estos, según hemos indicado, se reduce al mínimo la bilateralidad contractual. Íd., págs. 711-712, citando a *Zequeira v. CRUV*, 83 DPR 878, 881 (1961). Igualmente, como no hay deliberación anterior al contrato y este suele ser uniforme, la realidad de un consumidor se limita a decidir entre: (1) aceptar el esquema unilateralmente estructurado; o (2) retirarse del negocio. Íd., pág. 712. Es decir, o lo tomas o lo dejas.

En una sociedad en la que proliferan cada vez más los contratos de adhesión, se atenta contra la verdadera

libertad de contratación, pero sobre todo se suscita un dilema existencial cuando se trata del acceso a un servicio esencial, como lo es la energía eléctrica en Puerto Rico y la adquisición de fuentes alternas de energía.

En este tema, hemos precisado que la interpretación de los contratos de adhesión debe favorecer a la parte más débil económicamente y a la que no tuvo injerencia sobre la redacción del acuerdo. Íd.; *Herrera v. First National City Bank*, 103 DPR 724, 727 (1975). El propósito de aplicar esta norma responde a promover la igualdad jurídica, hasta donde sea posible. *Suárez Figueroa v. Sabanera Real, Inc.*, *supra*, págs. 712-713, citando a *Santiago v. Kodak Caribbean,* Ltd., 129 DPR 763, 776 (1992). Esto, además, debe ser conjugado con la norma codificada de que las cláusulas obscuras de un contrato no deben ser interpretadas para favorecer a la parte que hubiese ocasionado la obscuridad. Art. 1240 del Código Civil de 1930, 31 LPRA ant. sec. 3478.

Dicho todo lo anterior, la encomienda judicial de evaluar las cláusulas de arbitraje a la luz de nuestro derecho de obligaciones y contratos para resolver si fueron consentidas y pactadas válidamente nos lleva, paradójicamente, a una colisión con la doctrina de separabilidad, adoptada por este Tribunal en *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, tal y como explico en la próxima sección.

D.

A nivel federal, no sin recibir críticas[12], se ha desarrollado la doctrina de separabilidad, aplicable al momento de evaluar si existe un acuerdo válido de arbitraje. Véanse *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 US

---

[12] Para algunos tribunales estatales, la doctrina de separabilidad es inaplicable en su jurisdicción. Véanse *Shaffer v. Jeffery*, 915 P.2d 910 esc. 13 (Okla., 1996); *George Engine Co., Inc. v. Southern Shipbuilding Corp.*, 350 So.2d 881 (La. 1977); *Fouquette v. First American Nat. Securities, Inc.*, 464 N.W.2d 760 (Minn.App., 1991). Véanse, también, T. Baker, *Arbitration: Arbitration in the 21st Century: Where We've Been, Where We're Going*, 53 Okla. L. Rev. 653, 674 (2000); J. Douglas Stiner, *Arbitration: Shaffer v. Jeffery: The Oklahoma Supreme Court Rejects the Separability Doctrine and Takes A Step Back in the Enforcement of Arbitration Clauses Under Oklahoma Law*, 50 Okla. L. Rev. 243 (1997).

En *Shaffer v. Jeffery*, el Tribunal Supremo de Oklahoma resolvió que la ley estatal proarbitraje de ese entonces, idéntica a la FAA, no requería la separabilidad. Esa fue la norma vigente hasta el 2020 cuando ese mismo foro reconoció que una enmienda posterior impuso la doctrina. *Signature Leasing, LLC v. Buyer's Group, LLC*, 466 P.3d 544 (Okla., 2020).

Para una muestra de la visión académica, véanse T. Payne & R. Bales, *What A Contract Has Joined Together Let No Court Cast Asunder: Abolishing Separability and Codifying the Scope of the Provisions of Arbitration Agreements*, 120 W. Va. L. Rev. 537 (2017); Stephen J. Ware, *The Centrist Case Against Current (Conservative) Arbitration Law*, 68 Fla. L. Rev. 1227 (2016); S.J. Ware, *Arbitration Law's Separability Doctrine after Buckeye Check Cashing, Inc. v. Cardegna*, 8 Nev. L.J. 107 (2007); Z.M. Curtin, *Rethinking Prima Paint Separability in Today's Changed Arbitration Regime: The Case for Inseparability and Judicial Decisionmaking in the Context of Mental Incapacity Defenses*, 90 Iowa L. Rev. 1905 (2005); R. C. Reuben, *First Options, Consent to Arbitration, and the Demise of Separability: Restoring Access to Justice for Contracts with Arbitration Provisions*, 56 SMU L. Rev. 819 (2003); T.J. Monestier, *"Nothing Comes of Nothing" ... or Does It??? A Critical Re-Examination of the Doctrine of Separability in American Arbitration*, 12 Am. Rev. Int'l Arb. 223 (2001); T. Baker, *op. cit.*; A. Scott Rau, *"The Arbitrability Question Itself"*, 10 Am. Rev. Int'l Arb. 287, 335-336 (1999).

395 (1967) y su progenie. En términos sencillos, esta propugna que, si la impugnación se dirige al contrato en su totalidad, esta deberá ser atendida por un árbitro o árbitra; mientras que, si la impugnación está orientada específicamente hacia la cláusula arbitral, deberá ser resuelta por el tribunal. *Buckeye Check Cashing, Inc. v. Cardegna*, *supra*, págs. 445-446. Para nuestros homólogos federales, esa distinción responde al lenguaje de la FAA porque, a su juicio, al proveer un remedio a una parte que solicita el cumplimiento de una cláusula de arbitraje no permite que los tribunales federales consideren reclamaciones de fraude dirigidas al contrato en general. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, *supra*, págs. 403-404.[13]

Sin embargo, no se deben pasar por alto expresiones del propio alto foro federal que limitan el alcance de esta norma, tales como: (1) al decidir si las partes acordaron arbitrar cierta materia, incluyendo la "arbitrabilidad", los tribunales deben generalmente aplicar principios de derecho

---

[13] Esta lectura de la FAA obtuvo críticas instantáneas, lideradas por el Juez Asociado Hugo Black en una opinión disidente en *Prima Paint Corp. v. Flood & Conklin Mfg. Co., supra*. Para él, la intención legislativa del Congreso no fue crear una abarcadora ley federal sustantiva para imponerse sobre los tribunales estatales. Esta noción, a su vez, resonó en las voces de los Jueces Asociados Stevens y O'Connor en *Perry v. Thomas*, *supra*, y en la del Juez Asociado Thomas en *DirectTV, Inc. v. Imburgia*, 577 US 47 (2015), entre otros casos.

estatal relacionados a la formación de contratos[14]; (2) los desarrollos de la doctrina de separabilidad no pueden divorciarse del principio que subyace toda jurisprudencia de arbitraje: que el arbitraje es un asunto estrictamente de consentimiento y es una vía para resolver disputas, pero solo aquellas que las partes acordaron someter[15]; (3) por lo anterior, los tribunales deben ordenar el arbitraje de una disputa solo cuando se convencen de que ni la formación del acuerdo de arbitraje ni su aplicabilidad están en disputa, pues allí donde una parte cuestione uno o ambos asuntos, el tribunal debe resolverlo[16]; y (4) la aplicación de la presunción que favorece el arbitraje (y la separabilidad) únicamente se ha favorecido cuando refleja y deriva su legitimidad de una conclusión de que arbitrar una disputa en particular era la intención de las partes porque su acuerdo expreso de arbitrarla se formó válidamente, es legalmente ejecutable y abarca la disputa[17].

Al ser así, vale reiterar que el Tribunal Supremo federal también ha matizado que las causas para la revocación de un contrato, la equidad y las defensas generales aplicables a los contratos están disponibles para invalidar

---

[14] *First Options of Chicago, Inc. v. Kaplan*, 514 US 938, 944 (1995).

[15] *Granite Rock Co. v. International Broth. of Teamsters*, 561 US 287, 298-299 (2010).

[16] Íd., págs. 299-300.

[17] Íd., págs. 302-303.

acuerdos de arbitraje, incluso cuando es de aplicación la FAA.[18] *Doctor's Associates, Inc. v. Casarotto*, *supra*, págs. 686-687; *Allied-Bruce Terminix Cos. v. Dobson*, *supra*, pág. 281. Incluso, en ese análisis, no debe descartarse livianamente la doctrina de *unconscionability* o irrazonabilidad, basada en equidad, mediante la cual tribunales en los Estados Unidos han rechazado poner en vigor contratos que estiman irrazonables si son injustos, sustantivamente, u opresivos a una parte en maneras que sugieren abusos en su formación, procesalmente. Véanse, entre otros, M. Weston *et al.*, *Arbitration: Law, Policy and Practice*, 2nda ed., Durham, Carolina Academic Press, 2024, págs. 181-190; C. McCullough, *Unconscionability As A Coherent Legal Concept*, 164 U. Pa. L. Rev. 779 (2016); M. Lonegrass, *Finding Room for Fairness in Formalism – The*

---

[18] En *Allied-Bruce Terminix Cos. v. Dobson*, el Tribunal Supremo federal estableció:

> In any event, §2 [of the FAA] gives States a method for protecting consumers against unfair pressure to agree to a contract with an unwanted arbitration provision. States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause "upon such grounds as exist at law or in equity for the revocation of *any* contract." What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal "footing," directly contrary to the Act's language and Congress' intent. (Énfasis en el original) (Citas omitidas). *Allied-Bruce Terminix Cos. v. Dobson*, 513 US 265, 281 (1995).

*Sliding Scale Approach To Unconscionability*, 44 Loy. U. Chi. L.J. 1 (2012); S. Antonetti Zequeira, *Arbitraje Comercial en Puerto Rico: ¿Solución o problema?*, XI Rev. de la Academia Puertorriqueña de Jurisprudencia y Legislación 1 (2013); C. Knapp, *Blowing the Whistle on Mandatory Arbitration: Unconscionability As A Signaling Device*, 46 San Diego L. Rev. 609 (2009).

Más allá de eso, en *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, este Tribunal importó la doctrina de separabilidad a nuestra jurisdicción y, al así hacerlo, distanció artificialmente el cuestionamiento de una cláusula de arbitraje de la impugnación general de un contrato en el que haya un presunto pacto de arbitraje. De esa forma, se refirió al arbitraje la pregunta misma de si las partes están obligadas a arbitrar.

En esa ocasión, se entendió que esta doctrina era compatible con nuestra jurisdicción, especialmente por la política pública que favorece el arbitraje como método alterno de solución de disputas. *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, págs. 379-380. Esto se hizo, además, fundamentándose en las palabras del Juez Asociado del Tribunal Supremo señor Negrón García, respecto a que "si el razonamiento esbozado en la jurisprudencia federal o de otros estados de la Unión nos convence, es perfectamente apropiado acogerlo para resolver el caso que esté ante la consideración del Tribunal". Íd., pág. 380. Véase también *Pueblo v. Yip Berríos*, 142 DPR 386, 430 esc. 3 (1997)

(Opinión disidente del Juez Asociado señor Negrón García). A lo sumo, se estimó que la doctrina de separabilidad vigoriza la política pública proarbitraje. Íd.

En virtud de ello, se acogió la doctrina de separabilidad como una excepción a la norma general de nuestro andamiaje contractual, según la cual un pacto accesorio es nulo si el contrato principal es nulo. Íd., pág. 382. De esta forma, en un ejercicio de abstracción extrema, nos apartamos de la asentada tradición civilista y codificada de que las cláusulas accesorias al contrato principal dependen de este para su existencia y validez, lo cual las hace nulas si también lo es el contrato principal. Véanse *Municipio v. Vidal*, 65 DPR 370, 375 (1945); Arts. 1144 y 1161 del Código Civil de 1930, 31 LPRA ant. secs. 3204 & 3245. Estas cláusulas son, en esencia, incidentales a la obligación principal, las cuales hay que cumplir, pero que no son el motivo determinante del negocio. J.R. Vélez Torres, *Derecho de obligaciones: curso de derecho civil*, 2da ed., San Juan, Ed. U.I.A., 1997, pág. 67. Estas obligaciones, por su naturaleza dependiente, corren la misma suerte que las principales. *Municipio v. Vidal*, *supra*, pág. 375.

Los fundamentos citados para adoptar este curso de acción fueron varios. Por un lado, se interpretó la doctrina de separabilidad como una figura jurídica "lisonjera para resolver una controversia en particular". Íd. Asimismo, se destacó que la doctrina representaba un avance contra los prejuicios judiciales hacia el arbitraje y que, a su vez,

fue endosada en otros países como Inglaterra, España, Francia y Alemania. Íd., págs. 383-384.

Por otro lado, se subrayó una multiplicidad de razones de política pública para favorecer la doctrina, tales como: (1) evitar la duplicidad de procedimientos, al impedir que se requiera a un tribunal determinar la validez del acuerdo con el único propósito de establecer finalmente que un árbitro o árbitra tiene la autoridad para resolver la disputa contractual; (2) evitar que las partes utilicen tácticas dilatorias para retrasar o evadir el arbitraje; (3) honrar la intención de las partes al pactar el arbitraje; y (4) promover la conveniencia de que las partes puedan excluir la aplicación de la doctrina si redactan la cláusula de arbitraje utilizando un lenguaje que delimite su alcance. Íd., pág. 384. Esto último, se consideró independientemente de que el contrato sea uno de adhesión y de que la redacción de la cláusula no sea negociada y no esté al alcance de la parte con menor poder en la relación contractual.

Incluso más, el Tribunal en esa ocasión reconoció que no todas las controversias deberán referirse al arbitraje, pues una parte **debe tener derecho a ser escuchada en los tribunales, a "tener su día en corte", a menos que haya acordado someterse al arbitraje**. Íd., pág. 385, citando a J.J. Barceló III, *International Commercial Arbitration: Who decides the Arbitrator's Jurisdiction? Separability and Competence-Competence in Transnational Perspective*, 36 Vand. J. Transnat'l L. 1115, 1120 (2003). En ese sentido, también

se destacó que, para aplicarse la doctrina, será necesario que el acuerdo de arbitraje sea suficientemente amplio y que no limite la intervención arbitral a controversias claramente definidas. Íd. Por eso, se pautó que la labor judicial en este extremo implicará evaluar si la cláusula de arbitraje es taxativa o si es lo suficientemente amplia como para que la controversia sobre la validez del contrato principal sea adjudicada por un árbitro o árbitra. Íd., págs. 386-387.

Dicho todo esto, según adelanté, la acepción y aplicación irreflexiva de la doctrina de separabilidad da al traste con la encomienda judicial de evaluar la validez de las cláusulas de arbitraje a la luz de nuestro derecho de obligaciones y contratos, especialmente en cuanto al requisito esencial del consentimiento. En otras palabras, sostengo que nuestro derecho contractual opera en contra de la adopción de la doctrina de separabilidad y, sobre todo, de su aplicación precipitada, instintiva o mecánica cuando existe controversia sobre la formación del contrato.

Y es que con la aplicación automática de la doctrina de separabilidad se favorece desmedidamente que una parte evada la revisión judicial de un contrato, mediante la mera inclusión de lenguaje a favor del arbitraje, y así se prive a la otra parte de cuestionar si, en efecto, el contrato es válido y, por ende, si el pacto de arbitrar es legítimo.

En palabras de un autor, referir una disputa al arbitraje cuando no solo la cláusula de arbitraje está sujeta

a impugnación, sino el contrato en su totalidad, puede implicar perder de vista la principal y única pregunta: si existe un consentimiento legalmente ejecutable de someterse al arbitraje. A. Scott Rau, *"The Arbitrability Question Itself"*, 10 Am. Rev. Int'l Arb. 287, 335-336 (1999). De esa manera, no puede obviarse que la existencia de un acuerdo de arbitraje puede ser impugnada por otros vicios que cuestionan la existencia de un arreglo contractual vinculante en primer lugar.[19] Íd., pág. 335. Al fin y al cabo, ¿cómo puede validarse una cláusula de un contrato que se alega fue inducido mediante fraude, engaño o dolo cuando el contrato en su totalidad es posiblemente nulo?[20] Dicho de

---

[19] "[T]he existence of an 'agreement' to arbitrate may *also* be tainted by other flaws that call into question the very existence of a binding contractual arrangement in the first place: There is simply no agreement to *anything*, for example, where a signature has been forged, or where an authentic signature was obtained at gunpoint". (Énfasis en el original) (Citas omitidas). A. Scott Rau, *op. cit.*, pág. 335.

[20] El autor, Todd Baker, plantea la pregunta en estos términos: "This curious interpretation [that the federal court may only consider allegations of fraud regarding the arbitration clause itself] raises a serious question: How can a provision of an allegedly fraudulently induced contract be enforced when the contract as a whole is possibly void altogether? Again, the [Prima] Court seems to ignore this question entirely". T. Baker, *op. cit.*, pág. 662.

Asimismo, en palabras críticas del Juez Asociado Stevens, suscritas por el Juez Asociado Breyer y las Juezas Asociadas Ginsburg y Sotomayor, "Prima Paint y su progenie le permiten a un tribunal desprender un acuerdo de arbitraje potencialmente válido de un contrato potencialmente inválido". (Traducción nuestra). *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 85 (2010) (Opinión disidente del Juez Asociado Stevens).

otro modo, si existen dudas sobre la formación válida de un contrato en sí, ¿cómo no las va a haber sobre una cláusula contenida en él, así sea de arbitraje, y cómo se justifica obviarlas y someter a una de las partes a arbitrar?

Además, como sugiere esto último, la aplicación de la doctrina de separabilidad redunda en elevar los acuerdos de arbitraje a una posición superior y más fuerte con relación al resto de los contratos.[21] De ordinario, tendríamos reparos en que, durante el litigio de un caso, un tribunal hiciera valer una cláusula particular de un contrato cuya validez está bajo cuestionamiento en el mismo procedimiento. Sin embargo, un pacto de arbitraje no recibe el mismo tratamiento, a menos que, de alguna forma, la parte cuestione directamente la validez de la inclusión de esa disposición en el contrato igualmente cuestionado.

Por otra parte, como en el caso de epígrafe, la extensión de esta norma obvia que las acciones de una parte contratante en relación con la totalidad del contrato pueden afectar la inclusión de la cláusula de arbitraje. Son ejemplo perfecto de ello todas nuestras expresiones al respecto de que el que una parte guarde silencio o no revele hechos

---

[21] Amerita destacar que el Juez Asociado Hugo Black reiteró que ello iba directamente en contra de la intención legislativa de la FAA, de la cual se deriva la doctrina de separabilidad. A su juicio, lo deseado era únicamente colocar los acuerdos de arbitraje en la misma posición que otras obligaciones contractuales, dado el prejuicio existente en aquel entonces hacia este tipo de cláusula. *Prima Paint Corp. v. Flood & Conklin Mfg. Co., supra*, pág. 423 (Opinión disidente del Juez Asociado Black).

importantes durante el proceso de negociación podría viciar el consentimiento. Cónsono con nuestra jurisprudencia, esta acción podría implicar tanto dolo como violaciones al principio de buena fe. Y es lógico, toda vez que, aun tratándose de un pacto de arbitraje, si una parte guardó silencio – o peor, ofuscó o engaño a la otra – sobre un elemento esencial de un contrato, como con quién verdaderamente se contrataría, se podría viciar el consentimiento acerca del contrato y sus disposiciones.

Asimismo, igual que existe una política pública proarbitraje, en nuestra jurisdicción existen amplios estatutos y jurisprudencia a favor de la protección de los consumidores y las partes económicamente inferiores en las relaciones contractuales.[22] La aplicación de la doctrina de separabilidad, incluso en los casos más evidentes de contratos de adhesión e indistintamente de que se trate de productos o servicios esenciales, atenta contra estas

---

[22] Véanse, entre otros, la *Ley orgánica del Departamento de Asuntos del Consumidor*, Ley Núm. 5 de 23 de abril de 1973, según enmendada, 3 LPRA sec. 341 *et seq.*, y la Carta de Derechos del Consumidor en su Art. 7A, 3 LPRA sec. 341f-1; Art. 1240 del Código Civil de 1930, 31 LPRA ant. sec. 3478; *DACO v. LUMA y otros*, 2025 TSPR 126, 217 DPR ___ (2025); *Claro TV y Junta Regl. Tel. v. One Link*, 179 DPR 177, 188-189 (2010); *Suárez v. Levitt Homes*, 167 DPR 526, 530-531 (2006); *Martínez v. Rosado*, 165 DPR 582, 591 (2005); *Aponte v. Sears Roebuck de P.R., Inc.*, 144 DPR 830, 833-834 esc. 1 (1998); *Class v. Vehicle Eqmnt. Leasing Co.*, 143 DPR 186, 214 (1997); *Montero Saldaña v. Amer. Motors Corp.*, 107 DPR 452, 459 (1978).

nociones protectoras básicas.[23] Este efecto sería más irrazonable si el mecanismo impuesto, como en este caso, puede exponer a la parte reclamante, la cual está en una posición inferior de por sí, a la imposición de costas por la reclamación de su derecho, incluso aquel que sea estatutario. En el pasado, he advertido que medidas como la imposición de costas, honorarios legales y gastos del arbitraje a la parte más débil plantea un severo disuasivo o *chilling effect* sobre la vindicación de derechos estatutarios o, en este caso, de acceso a la justicia. *Kendall Hope Tucker v. Money Group, LLC y otros*, *supra*, pág. 23 (Opinión disidente del Juez Asociado Estrella Martínez). Además, debemos considerar que cuando se trata de la obtención de un servicio esencial y se presenta una falta de opciones reales de negociación, el interés de protección al consumidor o la parte más desventajada en la relación contractual aumenta notablemente.

Con todo esto en mente, si nuestra amplia adopción de la doctrina de separabilidad estuvo basada en razones de política pública, ciertamente sus efectos nocivos y contrarios a nuestros estatutos y a otras doctrinas deben llevarnos a reevaluar ese precedente.

---

[23] A nivel del más alto foro federal, las voces disidentes de las Juezas Asociadas Ginsburg y Sotomayor en *DirectTV, Inc. v. Imburgia*, *supra*, advirtieron que la extensión de la FAA por el Tribunal Supremo ha redundado en degradar los derechos de los consumidores, blindar los contratos de adhesión e insular a las compañías con gran poder económico de responsabilidad por sus actos.

III

En esta ocasión, teníamos la tarea de revisar la determinación del Tribunal de Apelaciones de revocar al Tribunal de Primera Instancia y, a mi entender, correctamente devolver el caso para la celebración de una vista evidenciaria con el único y limitado fin de evaluar la validez de la cláusula de arbitraje contenida en el contrato presuntamente pactado entre Máximo Solar y la señora Sierra Lugo.

Para el foro intermedio, la alegación de fraude y engaño en torno a la cláusula de arbitraje, así como la posibilidad de que esta fuera nula e ineficaz, debió llevar al Tribunal de Primera Instancia a celebrar la vista. En cambio, para el foro primario, este no poseía jurisdicción para entender sobre el caso, dado a que Máximo Solar demostró la existencia de un acuerdo de arbitraje sin que la señora Sierra Lugo expusiera detalladamente las circunstancias de fraude al negociar la cláusula de arbitraje ni realizara alegaciones específicas sobre la naturaleza engañosa o fraudulenta de esta cláusula.

Por su parte, Máximo Solar reiteró ante nos el razonamiento del foro primario. Por eso, como su posición es que la recurrida únicamente atacó de forma general la validez del contrato, sus alegaciones y el resto de la reclamación debían litigarse ante un árbitro o árbitra.

Entretanto, la señora Sierra Lugo sostuvo que nos correspondía resolver: (1) si las partes válidamente

pactaron una cláusula de arbitraje porque se cuestionó su inclusión independientemente de las reclamaciones generales sobre el contrato; y (2) si el contrato, por ser de adhesión, contenía cláusulas ambiguas que favorecían a la parte que las redactó. Sobre ello, reafirmó que, desde el inicio del pleito, alegó que la cláusula de arbitraje fue incluida como resultado de fraude y engaño. Igualmente, enfatizó que también adujo que Máximo Solar realizó representaciones falsas de que era la única compañía con la que contrataría y que no le proveyó copia física del contrato. Por todo ello, razonó que era necesario que el tribunal escuchara a las partes en una vista evidenciaria.

Habida cuenta de lo anterior, una mayoría de este Tribunal opta por modificar el dictamen del Tribunal de Apelaciones, dejar sin efecto la vista evidenciaria ordenada por este y, en su lugar, decretar la suspensión de los procedimientos ante el Tribunal de Primera Instancia. Esto, pues, según su criterio, la señora Sierra Lugo no incluyó una alegación específica dirigida a rebatir la presunción de validez de la cláusula de selección del foro arbitral y no especificó cuáles fueron los actos fraudulentos relacionados con la inclusión de esta. Por eso, la mayoría estimó que, como las alegaciones de vicio en el consentimiento se dirigieron a impugnar la validez del contrato en general, procedía aplicar la doctrina de separabilidad y someter la cuestión de la validez del contrato a la consideración de un árbitro o árbitra.

Como considero que, con este curso de acción, este Tribunal se aparta de lo que estimo prudente al momento de evaluar cláusulas de arbitraje en contratos de adhesión, cuya validez también es cuestionada desde un inicio por vicios al consentimiento, **respetuosamente disiento**. A diferencia del resultado al que se llega en esta ocasión, soy del criterio de que el Tribunal de Apelaciones actuó correctamente al devolver el caso al foro primario. Solo así se podría garantizar el "día en corte" de la recurrida para demostrar en qué consistió el fraude y el engaño que llevó a su contratación con Sunrun, el rol que jugó Máximo Solar en ello y la invalidez de la cláusula de arbitraje. A mi juicio, es tarea eminentemente judicial el evaluar primero si existió un acuerdo válido para arbitrar antes de obligar a las partes a someter su controversia a ese mecanismo, especialmente cuando se presentan planteamientos de fraude, engaño o inducción a error que potencialmente vician el consentimiento de una parte con poder desigual en un contrato de adhesión en el contexto de un servicio esencial, como lo es la energía eléctrica. En otras palabras, sostendría que determinar la validez de una cláusula de arbitraje en este escenario es un asunto inseparable del cuestionamiento al consentimiento del contrato en general.

A.

En primer orden, en lugar de desestimar o suspender los procedimientos, al devolverse el caso al foro primario y ordenarse una vista evidenciaria para atender la validez del

contrato entre las partes, se enfocaría la atención de ese tribunal única y principalmente en las alegaciones al respecto que la señora Sierra Lugo planteó desde un inicio. Al igual, como es sabido, el tribunal tendría a su disposición la herramienta de proveer para un descubrimiento de prueba limitado a la controversia jurisdiccional. *Molina v. Supermercado Amigo, Inc.*, *supra*, pág. 341. En este sentido, con este proceder no se presentarían las preocupaciones típicas de onerosidad, dilación y descubrimiento excesivo de prueba. Además, en un balance justo de intereses, más debería pesar la preocupación de someter a una parte a participar en el arbitraje cuando posiblemente no lo pactó válidamente.

Sin embargo, el resultado al que llega este Tribunal hoy le exige un grado de especificidad a la recurrida que no corresponde con la etapa de los procedimientos en la que se encuentra el caso. Más allá de ello, contradice lo que requiere la Regla 6.1 de Procedimiento Civil, *supra*, al momento de incluirse las alegaciones en la demanda. *León Torres v. Rivera Lebrón*, 204 DPR 20, 40 (2020); *Torres, Torres v. Torres et al.*, 179 DPR 481, 501-502 (2010). Esto, pues, se le colocó un peso desmedido a lo que debía plantear sobre fraude, error y dolo en la producción del contrato. Incluso así, un análisis de la *Demanda* y la oposición a la desestimación demuestran que la señora Sierra Lugo plasmó, desde un inicio, alegaciones que apuntaban a vicios en el consentimiento del contrato y el acuerdo de arbitrar.

Distinto a ese proceder, soy del criterio de que, enfrentado a la solicitud de desestimación, el foro primario debía analizar las alegaciones de forma liberal y favorable a la recurrida, dándolas por ciertas conforme al estándar de adjudicación aplicable y, de esa forma, correspondía concluir que la señora Sierra Lugo planteaba una reclamación que justificaría la concesión de un remedio.[24] Ello, pues, realizó alegaciones desde un principio que van a la médula de la formación del contrato y el acuerdo de arbitraje. Por eso, en vez de desestimar sin más, el Tribunal de Primera Instancia debía atender las alegaciones en una vista evidenciaria.

B.

En segundo orden, no coincido con la aplicación de la doctrina de separabilidad a espaldas de nuestro amplio y directamente vinculante derecho contractual. Al así proceder, se rehúye la tarea judicial – y la encomienda estatutaria – de evaluar si una parte consintió a someterse al arbitraje. Y es que razones de peso apoyan la aplicación

---

[24] Contrario a la actuación del foro primario al acoger la moción de desestimación como una solicitud de sentencia sumaria, lo correcto era atenderla según la Regla 10.2 de Procedimiento Civil, *supra*, a cuyo amparo se presentó. Esto, pues, más allá de adjuntar el contrato y alegar sobre sus disposiciones, Máximo Solar realmente no expuso materias no contenidas en la *Demanda*, toda vez que la señora Sierra Lugo realizó alegaciones sobre el contrato, su contenido y su invalidez. En ese punto, se encontraban en disputa dos (2) versiones sobre las mismas materias. Para la señora Sierra Lugo, sobre si el contrato se formó válidamente; para Máximo Solar, sobre si el contenido del contrato obligaba al arbitraje.

de un escrutinio mayor en este contexto, pues: (1) el arbitraje es una figura eminentemente contractual que, para su eficacia, requiere que las partes lo pacten de manera libre, deliberada, con conocimiento y conscientes de sus consecuencias; (2) el error, el dolo y hasta el silencio pueden viciar el consentimiento; (3) una violación a la buena fe que se deben las partes, ya sea en la negociación o en las fases previas, podría provocar que una de ellas no haya prestado su consentimiento válidamente; (4) no revelar hechos importantes u ofuscarlos podría implicar una falta a la buena fe que vicia el consentimiento; (5) estando en litigio un contrato de adhesión, que sobre todo tiene que ver con un servicio tan preciado como la energía eléctrica, así como con el ejercicio del derecho a la propiedad privada, lo correspondiente es proteger a la parte más débil económicamente que, además, no ha tenido injerencia sobre la redacción del acuerdo; y (6) razones de orden público, en protección de los consumidores frente a acuerdos con carácter leonino y prácticas desleales que toman una ventaja injustificada, podrían llevar a su declaración de nulidad.

Además de lo anterior, nuestro ordenamiento no reconoce como posible la separación de una obligación accesoria de aquella principal, de forma que la primera sea válida mientras que la segunda no. Si bien ello no debe motivar a los tribunales a fallar automáticamente a favor de esa parte, sí debe llevar a permitirle su "día en corte" para atender sus reclamos sobre la validez del contrato y el acuerdo de

arbitraje, en especial sin artificialmente separar un asunto del otro.

Sobre todo, lo que adujo la señora Sierra Lugo desde la presentación de la *Demanda* apunta a estas posibilidades. En un inicio, la recurrida alegó que Máximo Solar: (1) fue la única compañía con la que se comunicó; (2) previo a la contratación y durante ella, le representó falsamente que era la única compañía con la que contrataba; (3) no le brindó una copia del contrato hasta varios meses después de la instalación del equipo fotovoltaico; y (4) no le proveyó la oportunidad de revisar y leer el contrato antes de firmarlo electrónicamente. Este tipo de actuaciones, de ser ciertas, podía probar alguno de los fundamentos citados para viciar el consentimiento y así justificar un remedio a favor de la recurrida. Dicho lo anterior, correspondía garantizarle su día en corte para demostrar esas alegaciones.

Visto de este modo, las razones de política pública que llevaron a adoptar y aplicar la doctrina de separabilidad en *S.L.G. Méndez-Acevedo v. Nieves Rivera*, *supra*, no están presentes en este caso, sino que, por el contrario, son contradichas por nuestros estatutos y la jurisprudencia sobre el derecho contractual. A esto se suma, además, que es aconsejable la celebración de una vista cuando una determinación jurisdiccional como esta puede disponer de todo el caso, especialmente dadas las circunstancias ya descritas. Incluso, la celebración de una vista puntual y limitada a las alegaciones que se tengan sobre la validez y

la formación del contrato y de la cláusula de arbitraje atiende la preocupación de dilación excesiva que busca atender la doctrina.[25] De igual forma, se debe tener en cuenta que, de lo contrario, se podría estar refiriendo al arbitraje a partes que no consintieron a ello, con los costos y obstáculos que implica, únicamente porque el tribunal decide ignorar los cuestionamientos dirigidos a elementos esenciales del contrato.

IV

Por los fundamentos antes expuestos, respetuosamente disiento del curso de acción adoptado por una mayoría de este Tribunal. A diferencia de este, hubiese confirmado la *Sentencia* emitida por el Tribunal de Apelaciones y ordenado que el foro primario atendiera mediante vista evidenciaria las alegaciones legítimas sobre la invalidez de la cláusula de arbitraje en cuestión, incluida en un evidente contrato de adhesión.

Luis F. Estrella Martínez
Juez Asociado

---

[25] Ese, por cierto, es el mecanismo que requiere el Art. 4 de la *Ley de Arbitraje Comercial de* 1951, 32 LPRA sec. 3204, cuando, luego de oír a las partes sobre la existencia o validez de un convenio de arbitraje, el tribunal encuentra que se ha suscitado una controversia sobre la existencia, validez o incumplimiento de tal acuerdo.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Nancy Sierra Lugo<br><br>Recurrida<br><br>v.<br><br>Sunrun PR Operations, LLC; Máximo Solar Industries, Inc.; Aseguradoras ABC; John Doe; y Richard Roe<br><br>Peticionarios | CC-2024-0599 | |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 10 de julio de 2026.

En momentos en que nuestro País atraviesa una crisis energética, -- tanto por el costo como por la inestabilidad de ese servicio esencial --, cientos de miles de hogares puertorriqueños se han visto precisados a buscar alternativas que les permitan lidiar con esa problemática.[1] En respuesta a esa necesidad urgente, pautas comerciales de empresas que instalan sistemas de energía solar inundan los medios de comunicación, -- desde la radio y la televisión hasta las vallas publicitarias y la Internet --, anunciando tentadoras ofertas y prometiendo una mejor calidad de vida.

En ese contexto, imaginemos que representantes de una de esas empresas acuden a la casa de una puertorriqueña o de un puertorriqueño para instalar un sistema de energía solar,

---

[1] Según los datos reportados por la Administración de Información Energética de los Estados Unidos, para el mes de marzo de 2026, **unos 196,588 hogares puertorriqueños tenían instalados sistemas de generación de energía solar** participantes del programa de medición neta. U.S. Energy Information Administration, "Net metering", *Monthly Electric Power Industry Report*, marzo de 2026, https://www.eia.gov/electricity/data/eia861m/#netmeter.

y, durante el proceso, le acercan una tableta electrónica y le dicen: "deme su firmita por aquí", pretendiendo con ello amarrarle a una infinidad de obligaciones que ni tan si quiera pudo ver o conocer. Pues, de eso, en palabras sencillas, se trata la causa de epígrafe.

Así las cosas, ante esa nueva realidad impuesta por la digitalización del tráfico jurídico, nos parecía imperativo que este Alto Foro, como último intérprete de las leyes, hubiese examinado, -- con mayor detenimiento y consideración a las dinámicas contemporáneas --, el elemento del consentimiento contractual, necesario para la existencia de cualquier convenio vinculante. Ello, pues, descansar, -- como hoy lo hace una mayoría de este Tribunal --,[2] en los preceptos legales formulados a base de la lógica del acuerdo impreso y de la firma autógrafa ya resulta anacrónico.

Como una mayoría de mis compañeras y compañeros de estrado no lo hizo, procedemos, desde la disidencia, a así hacerlo. Veamos.

I.

Allá para el 4 de diciembre de 2023, la Sra. Nancy Sierra Lugo (en adelante, "señora Sierra Lugo") presentó, ante el Tribunal de Primera Instancia, una *Demanda* sobre incumplimiento de contrato y daños en contra de Sunrun PR

---

[2] Hoy se decide validar una cláusula de arbitraje contenida en un contrato **cuyo texto, -- según las propias alegaciones de la *Demanda* de autos --, no se le permitió leer ni revisar a la clienta reclamante antes de que se le estamparan sus iniciales y firma electrónica, y del cual tampoco se le entregó una copia.** Ello, con el objetivo de mantener en suspenso su reclamación, y, en consecuencia, obligarla a someterse a un procedimiento arbitral, sujetando así su derecho a tener un día en corte a la determinación que eventualmente se tome en el referido foro privado.

Operations, LLC (en adelante, "Sunrun") y Maximo Solar Industries, Inc. (en adelante, "Maximo Solar").

**En síntesis, en el referido escrito, expuso que, el 7 de septiembre de 2020, firmó electrónicamente un contrato de alquiler de un sistema de energía solar para su residencia,[3] sin que se le diera la oportunidad de revisar ni leer su contenido.**[4] Señaló, además, que, en ese momento, se le hizo creer erróneamente que estaba suscribiendo el referido acuerdo con la empresa Maximo Solar.

Asimismo, la señora Sierra Lugo alegó que el mencionado sistema de energía fotovoltaica falló a las dos (2) semanas de haber sido instalado, por lo que se comunicó con dicha compañía. Indicó que, a pesar de que Maximo Solar determinó que todo estaba bien, el referido sistema eléctrico se mantuvo inoperante durante unos seis (6) meses más.

Ante la relatada situación, la señora Sierra Lugo adujo que solicitó una copia del mencionado contrato a Maximo Solar, ya que nunca se le había provisto una. Mencionó que no fue hasta que recibió el duplicado del referido documento que tuvo acceso a la totalidad de los términos y condiciones

---

[3] Del contrato en cuestión se desprende que las iniciales y la firma atribuidas a la señora Sierra Lugo **fueron integradas a éste mediante la plataforma digital de manejo de firmas electrónicas y generación automatizada de documentos DocuSign,** las cuales están enmarcadas con un recuadro rotulado con las siglas "DS" o la frase "DocuSigned by:", seguidas de un código alfanumérico de identificación. **Además, el referido acuerdo indica, expresamente, que "Sunrun <u>generó de forma automática</u> este formulario el 9/7/2020".** (Énfasis suplido). *Contrato*, Apéndice del *certiorari*, pág. 178.

[4] *Demanda*, Apéndice del *certiorari*, pág. 77.

que establecía el acuerdo, así como advino en conocimiento de que, en realidad, había otorgado el contrato con Sunrun.[5]

De igual modo, la señora Sierra Lugo arguyó que así se enteró de que tenía un derecho contractual a recibir una copia completa del mismo antes de que se iniciara cualquier tipo de trabajo, cosa que indicó aquí no sucedió. Manifestó, además, que, a pesar de haber realizado múltiples gestiones tanto con Maximo Solar como con Sunrun, sus reclamos permanecieron sin resolverse y el sistema solar instalado en su casa se mantuvo sin funcionar por más de un (1) año.

En virtud de todo lo anterior, la señora Sierra Lugo solicitó, al foro primario, que: (1) declarara la nulidad y resolución del contrato en cuestión; (2) ordenara la remoción de los equipos y la devolución del dinero pagado; y (3) condenara a las empresas demandadas a indemnizarla por todos los daños contractuales y extracontractuales sufridos.

Luego de varias incidencias procesales innecesarias aquí pormenorizar, el 15 de febrero de 2024, Maximo Solar presentó, ante el foro primario, su *Contestación a la Demanda*.[6] En lo pertinente, argumentó que el mencionado

---

[5] A grandes rasgos, el contrato en cuestión contemplaba el arrendamiento del servicio de generación y almacenamiento de energía eléctrica mediante la instalación de un sistema, -- compuesto por paneles interconectados de celdas fotovoltaicas, inversores, baterías y otros equipos afines --, en la residencia de la señora Sierra Lugo, durante un término de tracto sucesivo de veinticinco (25) años y por un canon mensual de doscientos cuarenta y seis dólares ($246.00) para el primer año, con un aumento anual de un uno punto nueve por ciento (1.9%). En virtud de éste, Sunrun se obligó a monitorear proactivamente, así como proveer mano de obra y materiales para reparar o reemplazar el sistema de energía solar objeto del acuerdo durante veinticinco (25) años después de su instalación.

[6] Asimismo, el 8 de marzo de 2024, Maximo Solar interpuso, ante el foro primario, una *Solicitud de Desestimación*, mediante la cual esbozó, esencialmente, los mismos planteamientos de su escrito anterior.

contrato contenía una cláusula de arbitraje que requería desestimar el pleito al amparo de la Regla 10.2 de Procedimiento Civil, *infra*.

Según Maximo Solar, la mencionada disposición contractual exigía un proceso de arbitraje, -- a cargo de la organización Judicial Arbitration and Mediation Services, Inc. --, como el único medio de resolución de controversias entre ésta y sus clientes. Lo anterior, de conformidad con lo dispuesto en la Ley Federal de Arbitraje, *infra*.

Por su parte, el 18 de abril de 2024, la señora Sierra Lugo presentó, ante el Tribunal de Primera Instancia, una *Oposición a solicitud de desestimación*. En suma, planteó que existían hechos materiales en controversia que impedían desestimar su recurso sin la celebración de una vista evidenciaria. De igual modo, argumentó que la cláusula de arbitraje contenida en el contrato en controversia era nula e ineficaz, así como que debía interpretarse de manera desfavorable para la parte que la incluyó, por figurar en un contrato celebrado por adhesión.

**Habiendo evaluado los planteamientos de las partes, el 15 de mayo de 2024, el foro primario emitió una *Sentencia* mediante la cual acogió la solicitud de Maximo Solar y, en consecuencia, desestimó con perjuicio la *Demanda*. Esencialmente, el Tribunal de Primera Instancia razonó que la cláusula de arbitraje en cuestión era válida, exigible e irrevocable, conforme a las leyes estatales y federales**

**aplicables; y que las alegaciones de fraude no cumplieron con la especificidad requerida por el ordenamiento procesal.**

Inconforme con tal proceder, el 17 de junio de 2024, la señora Sierra Lugo presentó, ante el Tribunal de Apelaciones, una *Apelación*. En ésta, señaló que el foro primario erró al desestimar con perjuicio su reclamación sin haberle permitido celebrar una vista evidenciaria en la que pudiera demostrar la nulidad e ineficacia del contrato en virtud del cual se le obligó a someterse a un foro arbitral.

Por su parte, el 29 de julio de 2024, Maximo Solar presentó, ante el foro apelativo intermedio, su correspondiente *Alegato en oposición a recurso de apelación*. Mediante éste, y, en esencia, dicha parte expuso los mismos fundamentos que había esbozado previamente para solicitar la desestimación del pleito.

**Examinados los alegatos de ambas partes, el 7 de agosto de 2024, el Tribunal de Apelaciones emitió una *Sentencia*, en virtud de la cual revocó el dictamen del Tribunal de Primera Instancia. En síntesis, concluyó que, conforme al estándar aplicable a una solicitud de desestimación, el foro primario incidió al disponer del pleito con perjuicio sin antes celebrar una vista evidenciaria para evaluar la validez de la cláusula de arbitraje, siendo ello una tarea que le compete particularmente a los tribunales.**

En desacuerdo con el revés judicial, y, tras solicitar reconsideración infructuosamente, el 27 de septiembre de 2024, Maximo Solar compareció ante nos mediante el *Recurso*

*de certiorari civil* de epígrafe. En éste, esencialmente, imputa al foro apelativo intermedio haber errado al revertir el dictamen desestimatorio emitido por el Tribunal de Primera Instancia y ordenar la celebración de una vista evidenciaria, ante la defensa de falta de jurisdicción por la existencia de un acuerdo de arbitraje, el cual se presume válido.

Por su parte, el 11 de abril de 2025, la señora Sierra Lugo acudió ante nos mediante un *Alegato de certiorari civil [de la] parte recurrida*. En síntesis, argumenta que el Tribunal de Apelaciones actuó conforme a derecho al recovar el dictamen recurrido y al exigir la celebración de una vista evidenciaria, toda vez que el estándar de adjudicación de una solicitud de desestimación requiere considerar como ciertas todas las alegaciones bien hechas en la *Demanda*, así como resolver toda duda en favor de la parte que se vería privada de tener su día en corte.

**Sobre el particular, la señora Sierra Lugo abunda que, al haberse alegado la invalidez del acuerdo, resultaba necesario que el foro primario permitiera la presentación de prueba, de modo que estuviese en posición de decidir si el acuerdo de arbitraje era válido o no. Ello, como asunto de umbral para disponer del pleito u ordenar su continuación.**

**Asimismo, dicha parte enfatiza que el presente litigio está enmarcado por una práctica desleal de las compañías de energía solar, que consiste en incluir cláusulas de arbitraje en sus contratos, "las cuales no sólo no explican, sino que ni tan siquiera mencionan a sus clientes, induciéndolos a**

**error y a firmar electrónicamente y sin [proveerles] copia".** (Énfasis suplido). *Alegato de certiorari civil [de la] parte recurrida*, pág. 5.

Como adelantamos, hoy, una mayoría de este Tribunal concluye, -- a nuestro juicio, erradamente --, que procede obligar a las partes a someterse, -- a sus expensas --, a un arbitraje, al sujetar la continuación de los procedimientos ante el Tribunal de Primera Instancia a la determinación de tal foro privado. Lo anterior, en un escenario en el que, además, se le priva a la parte demandante la oportunidad de probar, -- en una vista evidenciaria --, sus alegaciones de que no tuvo la oportunidad de leer o revisar el acuerdo al cual se le estamparon sus iniciales y firma, y de cuya faz surge de que fue generado automáticamente mediante una herramienta digital.

Con tal proceder, como ya mencionamos, no podemos coincidir. Así, pues, examinemos a continuación los fundamentos que motivan nuestro disenso.

II.

A.

i.

Como es sabido, toda parte contra la que, en nuestra jurisdicción, se interponga una demanda puede solicitar su desestimación al amparo de la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V. *Díaz Vázquez et al. v. Colón Peña et al.*, 214 DPR 1135 (2024); *Costas Elena y otros v. Magic Sport y otros*, 213 DPR 523, 533 (2024); *Eagle Security v. Efrón*

*Dorado et al.*, 211 DPR 70 (2023). La referida regla permite hacer tal solicitud por las siguientes razones: (1) falta de jurisdicción sobre la materia; (2) falta de jurisdicción sobre la persona; (3) insuficiencia del emplazamiento; (4) insuficiencia del diligenciamiento del emplazamiento; (5) dejar de exponer una reclamación que justifique la concesión de un remedio; o (6) dejar de acumular una parte indispensable. *Díaz Vázquez et al. v. Colón Peña et al.*, *supra*; *Rivera, Lozada v. Universal*, 214 DPR 1007 (2024); *Costas Elena y otros v. Magic Sport y otros*, *supra*; *Conde Cruz v. Resto Rodríguez et al.*, 205 DPR 1043 (2020).

## ii.

En lo relacionado con los primeros dos escenarios en los que se puede solicitar la desestimación de una demanda, debemos recordar que la jurisdicción es el poder o la autoridad que posee un tribunal para atender y adjudicar un caso o controversia. *Friger Salgueiro v. Mech-Tech Coll., LLC*, 2026 TSPR 30, pág. 4, 218 DPR ___ (2026); *Mojica Rodríguez v. ESSROC*, 2026 TSPR 47, pág. 8, 218 DPR ___ (2026); *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 935 (2011). Al respecto, hemos sentenciado que los tribunales deben ser celosos guardianes de su jurisdicción y, de carecer de ésta, sólo resta que así lo declararen y desestimen la reclamación sin entrar en los méritos de la controversia. *MCS Advantage, Inc. v. Fossas Blanco*, 211 DPR 135, 146 (2023); *Allied Mgmt. Group v. Oriental Bank*, 204 DPR 374, 386-387 (2020); *S.L.G. Sola-Maldonado v. Bengoa Becerra*, 182

DPR 675, 682-683 (2011). Lo anterior es así, debido a que la falta de jurisdicción: (1) no es susceptible de ser subsanada; (2) las partes no pueden voluntariamente conferírsela ni abrogársela al tribunal; y (3) conlleva la nulidad de los dictámenes emitidos. *Asoc. Fotoperiodistas v. Rivera Schatz*, supra; *Pagán v. Alcalde Mun. De Cataño*, 143 DPR 314, 326 (1997); *Vázquez v. Administración de Reglamentos y Permisos*, 128 DPR 513, 537 (1991). Así pues, cuando la parte demandada entienda que un foro carece de jurisdicción, tiene la opción de interponer tal defensa, ya sea en una moción de desestimación o en la contestación a la demanda. R. Hernández Colón, *Práctica jurídica de Puerto Rico: derecho procesal civil*, 4ta ed., San Juan, Ed. Lexis Nexis, 2007, Sec. 2601, pág. 230.

iii.

**Ahora bien, indistintamente de lo anterior, para que proceda un planteamiento desestimatorio bajo la Regla 10.2 de Procedimiento Civil,** *supra*, **se tiene que demostrar, de forma certera, que la parte demandante no tiene derecho a remedio alguno bajo cualquier estado de derecho que se pudiese probar en apoyo a su reclamación, aun interpretando la demanda lo más liberalmente en su favor.** *Rivera San Feliz v. Junta de Directores,* 193 DPR 38, 49 (2015); *Ortiz Matías et al. v. Mora Development*, 187 DPR 649, 654 (2013). **Para ello, los tribunales están obligados a tomar como ciertos todos los hechos bien alegados en la demanda y considerarlos de la forma más favorable a la parte demandante.** *Rivera,*

*Lozada v. Universal*, *supra*; *Cobra Acquisitions v. Mun. Yabucoa et al.*, 210 DPR 829, 396 (2022); *Casillas Carrasquillo v. ELA*, 209 DPR 240, 247 (2022); *Cruz Pérez v. Roldán Rodríguez et al.*, 206 DPR 261, 267 (2021). **En ese sentido, el asunto a evaluarse no radica en dictaminar si la parte demandante prevalecerá finalmente en el pleito, sino, más bien, si ésta tiene o no derecho a continuar con su caso.** J. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, 2da. ed., Publicaciones JTS, 2011, T. II, págs. 270-272.

Así pues, teniendo esas normas procesales en mente, debemos evaluar si, tomando como ciertas las alegaciones de la presente reclamación y despejando toda duda de la manera más favorable para la parte demandante, procedía su desestimación a la luz del derecho aplicable al remedio solicitado. Estamos convencidos de que no. Veamos el porqué.

B.

i.

Como se sabe, con el fin de promover una política pública liberal en favor de los acuerdos de arbitraje, así como de eliminar la hostilidad existente hacia ese mecanismo de resolución de conflictos, el Congreso de los Estados Unidos promulgó la Ley Federal de Arbitraje (en adelante y por sus siglas en inglés, "FAA"), 9 USCA sec. 1 *et seq.* *Aponte Valentín et al. v. Pfizer Pharm.*, 208 DPR 263, 279 (2021); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008). **Así, el referido estatuto federal**

dispone que la mayoría de los contratos comerciales en que se establecen acuerdos de arbitraje entre las partes otorgantes serán válidos, exigibles e irrevocables, salvo en aquellos casos en que el acuerdo mediante el cual se instrumenten sea revocable por las causas que invaliden cualquier otro contrato en derecho o en equidad.[7]

**A la luz de la precitada disposición, el Tribunal Supremo de Estados Unidos ha reiterado que el "arbitraje es un asunto de contrato y de consentimiento".** (Énfasis suplido). *Coinbase, Inc. v. Suski*, 602 U.S. 143, 145 (2024); *AT&T Mobility LLC v. Concepcion*, *supra*, pág. 339; *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). **En consecuencia, como los acuerdos de arbitraje son simplemente contratos, el punto de partida al enfrentarse a cualquier controversia que los involucre radica en evaluar si existe un consentimiento contractual de las partes para someterse a ese mecanismo.** *Coinbase, Inc. v. Suski*, pág. 148; *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 183-184 (2019); *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

De igual modo, -- y, por exigencia expresa del FAA, *supra*, y de su jurisprudencia interpretativa --, las

---

[7] Específicamente, la Sec. 2 del FAA, 9 USCA sec. 2, dispone:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction […] shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

legislaturas y los tribunales estatales están obligados a tratar los acuerdos de arbitraje comprendidos bajo el referido estatuto en igualdad de condiciones que el resto de los acuerdos vinculantes, conforme a las normas generales de contratación de cada jurisdicción. *Rent-A-Center, West, Inc. v. Jackson*, *supra*, págs. 67-68; *AT&T Mobility LLC v. Concepcion*, *supra*, pág. 341; *Lamps Plus, Inc. v. Varela*, *supra*, pág. 183; *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). Así debió haberse hecho en el presente caso, pero una mayoría de mis compañeras y compañeros de estrado no lo hizo.

ii.

Ahora bien, el Alto Foro Judicial federal ha delineado ciertas normas para establecer qué ente, -- si un árbitro o un tribunal --, tiene jurisdicción primaria para determinar la validez y extensión de tales acuerdos, dependiendo del tipo de impugnación de la que se trate, conforme a lo que se ha denominado como la "doctrina de separabilidad" (*severability doctrine*).

A tenor de ésta, cuando las partes contratantes acuerdan, de manera expresa, que cualquier objeción respecto a la arbitrabilidad de las controversias que puedan surgir entre ellas será atendida por un árbitro, operarán las siguientes normas: (1) si la impugnación se dirige a la validez general del contrato, la adjudicación de la arbitrabilidad le corresponderá al foro arbitral; pero si se alega, de manera particularizada, que la cláusula de

arbitraje específicamente es inválida por haber sido incorporada mediante fraude o engaño, entonces le corresponde al foro judicial atender tal planteamiento. *Rent-A-Center, West, Inc. v. Jackson*, *supra*, págs. 70-72; *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444-445 (2006); *Prima Paint Corp. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404 (1967).

Lo anterior es así, toda vez que, ante la existencia de un contrato por escrito entre las partes, el FAA, *supra*, establece que un acuerdo de arbitraje contenido en él será válido, exigible e irrevocable, sin mencionar la validez del resto del convenio. *Íd.* En consecuencia, si se impugna la validez de todo el contrato o de una parte específica de él distinta del acuerdo de arbitraje, -- por ejemplo, porque fueron producto de dolo o porque alguna ley permite invalidar el acuerdo a base de alguna de sus provisiones --, el derecho sustantivo federal en materia de arbitraje requiere que se "separe" el acuerdo de arbitraje del resto del convenio, de modo que subsista la eficacia del primero. *Íd.*

**Sin embargo, -- y de particular importancia para la correcta disposición de las controversias que hoy nos ocupan --, al desarrollar la doctrina de separabilidad, el Tribunal Supremo federal ha dejado claro que la vertiente de la impugnación generalizada de la validez del contrato se distingue de aquellos supuestos en los que no se haya llegado a configurar un contrato, por haber estado ausente**

**alguno de los elementos indispensables para su perfeccionamiento.**[8] Véase *Rent-A-Center, West, Inc. v. Jackson*, *supra*, pág. 70 esc. 2; y *Buckeye Check Cashing, Inc. v. Cardegna*, *supra*, pág. 444 esc. 1. **Específicamente, el Tribunal Supremo de Estados Unidos precisó que "la controversia sobre la validez del contrato es distinta de la controversia de si se perfeccionó un acuerdo entre el acreedor y el deudor".**[9] (Traducción nuestra y énfasis suplido). *Buckeye Check Cashing, Inc. v. Cardegna*, *supra*, pág. 444 esc. 1.

La razón para tal distinción es muy sencilla: si no se llegó a materializar un contrato vinculante por la inexistencia de alguno de los requisitos indispensables para el perfeccionamiento de cualquier convenio, conforme a las normas generales de contratación de cada jurisdicción, pues, realmente, no cabe hablar de que existió un acuerdo. Es decir, ante la inexistencia absoluta o radical de un contrato, no hay forma alguna de "separar" una cláusula de arbitraje del resto de un acuerdo impugnado. **<u>Sin contrato, no hay arbitraje; y sin arbitraje, lo que procede es que el</u>**

---

[8] Como ejemplos de tales circunstancias en las que no se llega a perfeccionar un contrato por la ausencia de un elemento indispensable, -- de modo que no les aplica la doctrina de separabilidad --, el Tribunal Supremo federal mencionó los **cuestionamientos relativos a la firma del contrato,** la falta de autoridad de un mandatario para obligar a su mandante y la **capacidad mental del suscribiente para prestar su consentimiento al acuerdo.** *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 esc. 1 (2006).

[9] ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded").

**foro judicial o administrativo competente dilucide las controversias planteadas, tal y como ocurre de ordinario**.

Así, pues, aclarado lo anterior, -- y, partiendo de la premisa fundamental de que el arbitraje es esencialmente un asunto de contrato y consentimiento --, nos corresponde ahora examinar las normas generales de contratación bajo el ordenamiento civil puertorriqueño, de modo que podamos evaluar si aquí se llegó a perfeccionar un contrato, conforme a las alegaciones de la *Demanda* de epígrafe.[10]

C.

i.

**Como se sabe, el contrato es el negocio jurídico bilateral por el cual dos (2) o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones.** Art. 1230 del Código Civil, 31 LPRA sec. 9751. Por otro lado, las obligaciones son los vínculos jurídicos de carácter patrimonial en virtud de los cuales la parte deudora tiene el deber de ejecutar una prestación que consiste en dar, hacer o no hacer algo en provecho de la parte acreedora, la cual, a su vez, tiene un derecho de crédito para exigir su cumplimiento. Art. 1060 del Código Civil, 31 LPRA sec. 8981.

---

[10] Si bien reconocemos que las disposiciones aplicables a los hechos de marras son las del Código Civil de 1930, hemos decidido hacer referencia aquí a los artículos correspondientes del vigente Código Civil de 2020, siempre que recojan esencialmente las mismas normas que su predecesor o codifiquen los principios de interpretación contractual desarrollados en la jurisprudencia de este Tribunal aplicables a la presente controversia.

**Un contrato se perfecciona cuando las partes manifiestan su consentimiento sobre el objeto y la causa que lo motiva, salvo en los casos en que se requiera alguna formalidad solemne o se pacte una condición suspensiva.** Art. 1237 del Código Civil, 31 LPRA sec. 9771. **Es decir, sin consentimiento no hay contrato.** *In re Feliciano Ruiz*, 117 DPR 269, 276 (1986); *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 886 (2008); *Bosques v. Echevarría*, 162 DPR 830, 836 (2004).

Sobre este último extremo, se considera que existe consentimiento por el concurso entre una oferta y su correspondiente aceptación, cuando el oferente recibe la aceptación.[11] Art. 1238 del Código Civil, 31 LPRA sec. 9772.

**Por ello, el tratadista Luis Medina de Lemus nos señala que, para la adecuada formación de un contrato, el "consentimiento debe manifestarse de un modo libre y consciente".**[12] (Énfasis suplido). M. Medina de Lemus, *Derecho civil*, Madrid, Ed. Dilex, 2004, T. II, Vol. 1, pág.

---

[11] **Se entiende por oferta el acto unilateral dirigido a una persona determinable mediante el cual se le expresan todos los elementos necesarios para la existencia del contrato propuesto** o el medio para establecerlos. Art. 1239 del Código Civil, 31 LPRA 9773. La aceptación se refiere al acto unilateral, puro y simple mediante el cual se presta conformidad a una oferta. Art. 1241 del Código Civil, 31 LPRA 9775.

[12] **En iguales términos se expresan Castán y Puig Brutau. Al respecto, Castán nos señala que el consentimiento, -- al cual describe como el "elemento más sustancial" y el cual "constituye el alma del contrato" --, "resulta por la conjunción de voluntades conscientes, inteligentes y libres".** (Énfasis suplido). J. Castán Tobeñas, *Derecho civil español, común y* foral, Madrid, Ed. Reus, 2008, T. 3, págs. 636-637. **Asimismo, Puig Brutau nos indica que "es necesario que el contrato nazca como obra de la voluntad libre y consciente de los que lo otorgan", de modo que, "[p]ara que exista contrato ha de haber un consentimiento serio, espontáneo y libre".** (Énfasis suplido). J. Puig Brutau, *Fundamentos de derecho civil*, Barcelona, Ed. BOSCH, 1988, T. II, Vol. I, pág. 73.

290. **De igual modo, el Prof. José R. Vélez Torres nos explica que, la "prestación del consentimiento, para que sea considerada válida, presume una voluntad capaz que sea, además, libre y que tenga completo conocimiento sobre lo que está haciendo".** (Énfasis suplido). J.R. Vélez Torres, *Curso de derecho civil*, San Juan, Ed. UIPR, 1990, T. IV, Vol. II, pág. 45.

Nótese que nuestro ordenamiento integra los elementos esenciales del contrato como un sistema interdependiente, de modo que no cabe hablar de un consentimiento prestado en el vacío o desvinculado del resto de los requisitos indispensables de objeto y causa. Por lo tanto, para que exista un consentimiento que perfeccione un contrato, se requiere que éste se preste específicamente respecto a las obligaciones que conforman el acuerdo del que se trate.

**Dicho de otro modo, el consentimiento contractual exige, como condición mínima absoluta, que las partes contratantes tengan, por lo menos, una oportunidad real de conocer los términos y condiciones del convenio para el que se preste. Adelantamos, ello no sucedió aquí, conforme a lo alegado en la *Demanda* de epígrafe.**

ii.

Al respecto, resulta imprescindible distinguir entre: (1) la ausencia total o radical del elemento de consentimiento; y (2) las causas de anulación del contrato por haber mediado algún vicio de la voluntad en la prestación de tal conformidad. Lo anterior así, pues, de

tal diferenciación depende si el negocio jurídico es nulo de pleno derecho (entiéndase, que nunca existió como cuestión jurídica); o si, por el contrario, es meramente anulable (es decir, aunque existió, se invalida por decreto judicial).

**Recordemos que un contrato es nulo de pleno derecho cuando alguno de sus elementos esenciales, -- a saber, el consentimiento, el objeto y la causa --, es inexistente; mientras que es anulable si concurre algún vicio de la voluntad.**[13] Art. 342 del Código Civil, 31 LPRA 6312.

Respecto a este segundo escenario, la ley establece que el error, el dolo, la violencia y la intimidación vician la voluntad, de modo que el negocio jurídico en el que medie alguno de estos defectos será anulable si fue determinante para su otorgamiento. Arts. 285 y 286 del Código Civil, 31 LPRA secs. 6191 y 6192. Entiéndase, en estos casos, no hay duda de que se prestó un consentimiento para perfeccionar el negocio jurídico; lo que sucede es que ese consentimiento se prestó bajo unas circunstancias que lo contaminan o lo desvirtúan de tal manera que podrían justificar su anulación.

---

[13] **Sobre el particular, Puig Brutau nos ilustra que por "nulidad de pleno derecho, llamada también nulidad radical o absoluta, se entiende aquella imperfección de los contratos que le impide producir sus propios efectos", debido a que, -- a diferencia de las causas de anulación que establece el Código Civil --, el aparente acuerdo fue "celebrado en contravención con normas imperativas o prohibitivas, o por faltarle alguno de sus requisitos esenciales".** (Énfasis suplido). J. Puig Brutau, *Fundamentos de derecho civil*, Barcelona, Ed. BOSCH, 1988, T. II, Vol. I, págs. 286-287.

**En cambio, la ausencia total o radical del consentimiento se refiere a algo distinto. Se trata, pues, de que la falta de este elemento indispensable del contrato impide el perfeccionamiento mismo del convenio. Por tal razón, Medina de Lemus nos comenta que "[b]asta que no pueda darse el consentimiento, el objeto o la causa para que, mejor que de nulidad, pueda hablarse de inexistencia" del contrato.** (Énfasis suplido). Medina de Lemus, *op. cit.*, pág. 361.

iii.

Ahora bien, no empece a todo lo anterior, debemos recordar aquí que toda relación contractual, -- antes, durante y después de su perfeccionamiento y ejecución --, se tiene que regir por el principio fundamental de la buena fe, el cual permea todo el ordenamiento jurídico. *Prods. Tommy Muñiz v. COPAN*, 113 DPR 517, 528 (1982); *Colón v. Glamorous Nails*, 167 DPR 33, 44-46 (2006); *PRFS v. Promoexport*, 187 DPR 42, 56-58 (2012). **Así, y, como una de las vertientes de la buena fe, se ha reconocido que las partes contratantes tienen un deber de obtener y proporcionar información de circunstancias de hecho y de derecho en las etapas conducentes al perfeccionamiento del acuerdo.** *S.L.G. Ortiz-Alvarado v. Great American*, 182 DPR 48, 65-66 (2011); *S.L.G. Silva-Alicea v. Boquerón Resort*, 186 DPR 532, 548 (2012); *Bosques v. Echevarría*, 162 DPR 830, 836 (2004); *BPPR v. Sucn. Talavera*, 174 DPR 686, 697-698 (2008). Véase, también, Art. 1271, 31 LPRA sec. 9881.

**Por supuesto, subsumido en tal principio se encuentra el deber de divulgar o presentar íntegramente el texto del acuerdo; especialmente, cuando se trate de los llamados "contratos celebrados por adhesión", esos que sólo redacta una de las partes y la otra se ve precisada a aceptar su contenido.** Art. 1248 del Código Civil, 31 LPRA sec. 9802. Sobre el particular, nos parece en extremo pertinente el planteamiento desarrollado por el Prof. Michel J. Godreau Robles en su ampliamente citado artículo *Lealtad y buena fe contractual*, 58 Rev. Jur. UPR 367, 379 (1989).

**Allí, el profesor Godreau Robles nos señala que la "doctrina de la buena fe podría utilizarse para atemperar el grado evidente de desbalance negocial que se da en varias facetas de los contratos de adhesión", como, por ejemplo, mediante un ajuste jurisprudencial de las normas "respecto al perfeccionamiento de estos contratos, la doctrina sobre la forjación del consentimiento y los defectos que puedan viciarlo".** (Énfasis suplido). *Íd.*, pág. 419.

En esa dirección, el referido estudioso trae a nuestra atención que, en el caso de los contratos de adhesión, "no tiene sentido hablar de negociación, pues la característica de este tipo de contratación es precisamente la eliminación de esa fase". *Íd.* Por lo tanto, el profesor Godreau Robles nos plantea que se justifica trasladar las normas de la buena fe que hemos desarrollado para esa etapa precontractual a su equivalente en los contratos celebrados por adhesión, la cual denomina la "publicidad de la oferta".

*Íd.* **En específico, dicho académico nos sugiere "instaurar como defensa la anulación del contrato que se logra mediante una oferta o publicidad que no responde a las exigencias de la buena fe, porque no es leal y honesta, aunque no podamos ubicarla dentro de los parámetros tradicionales del dolo".** (Énfasis suplido). *Íd.*, pág. 420.

**En sintonía con lo anterior, el profesor Godreau Robles nos propone reconocer, como corolario del principio de la buena fe, el "deber de todo contratante-dictador de: (1) no sólo divulgar todos los términos y condiciones de la contratación, sino de (2) cerciorarse de que el consumidor con quien contrata entienda tales términos y condiciones".** (Énfasis suplido). *Íd.* Es decir, más allá de nuestra posición respecto a la exigencia mínima de la divulgación del contenido del contrato para materializar un consentimiento que lo perfeccione, el mencionado catedrático considera, como una vertiente de la buena fe contractual, el deber de que la parte que redacte el acuerdo, -- a saber, la de mayor poder en la negociación --, se asegure de que la parte que se ve precisada a aceptar su contenido, -- entiéndase, la más vulnerable --, comprenda lo que está aceptando.

**Y es que, -- en armonía con la introducción de este escrito y como bien señala el profesor Godreau Robles --, las empresas han llegado "al extremo de crear en los consumidores la creencia […] de que muchos de los productos y servicios que se ofrecen son indispensables para el**

**disfrute de la vida moderna", para lo que se "valen de todas las artimañas de la psicología mercantil utilizando los medios masivos de comunicación, logrando así que muchas personas se lancen al perfeccionamiento de contratos que representan verdaderas cargas económicas, y cuyos beneficios distan mucho de lo prometido".** (Énfasis suplido). *Íd.* **Tal, nos parece, es el caso de autos.**

D.

Por último, debido a que la presente controversia gira en torno a un contrato efectuado automáticamente mediante una plataforma digital de integración de manejo de firmas electrónicas, conviene aquí examinar también las disposiciones de la Ley Núm. 148 de 8 de agosto de 2006, conocida como *Ley de Transacciones Electrónicas*, 10 LPRA sec. 4081 *et seq.* (en adelante, "Ley Núm. 148-2006"). Estatuto aprobado en atención "a los grandes adelantos en la tecnología informática y el vertiginoso crecimiento de dicha tecnología en el ámbito comercial", -- situación que ha facilitado que la ciudadanía pueda "realizar por vía electrónica todo tipo de transacciones" --; pero, a su vez, procurando "controles suficientes para prevenir el fraude y los abusos potenciales". Exposición de motivos de la Ley Núm. 148-2006, *supra*.

**A esos fines, dicha ley establece que "[n]o se le restará efecto o validez legal a un Documento Electrónico o Firma Electrónica por el mero hecho de estar en formato electrónico", así como tampoco "se le restará efecto o**

**validez legal a un contrato por haberse utilizado un Documento Electrónico en su formación"**. (Énfasis suplido). Art. 7 (a) y (b) de la Ley Núm. 148-2006, 10 LPRA sec. 4086. Es decir, mediante tal disposición estatutaria, se les extendió validez legal a los instrumentos digitales, tal y como si estuviesen impresos y suscritos a puño y letra.

Ahora bien, de las precitadas normas, surgen varios conceptos que debemos examinar. **Particularmente, la Ley Núm. 148-2006, *supra*, define "contrato" como "la obligación legal que resulta del acuerdo entre las partes, conforme con esta Ley y otras leyes aplicables"**. (Énfasis suplido). Art. 2 (6) de la Ley Núm. 148-2006, 10 LPRA sec. 4081.

Asimismo, la ley precisa que "documento electrónico" se refiere a un "archivo creado, generado, enviado, comunicado, recibido o almacenado por cualquier medio electrónico". Art. 2 (8) de la Ley Núm. 148-2006, *supra*. **Además, el precitado estatuto define "firma electrónica" como la "totalidad de datos en forma electrónica consignados en un mensaje, documento o transacción electrónica, o adjuntados o lógicamente asociados a dicho mensaje, documento o transacción, que puedan ser utilizados para identificar al signatario e indicar que éste aprueba la información recogida en el mensaje, documento o transacción"**. (Énfasis suplido). Art. 2 (13) de la Ley Núm. 148-2006, *supra*.

A la luz de las definiciones que anteceden, se desprende que el marco de operación y validez de los referidos

instrumentos y procesos electrónicos están subordinados a los requisitos sustantivos que establece nuestro ordenamiento jurídico para el perfeccionamiento de todo acuerdo vinculante, con especial atención al consentimiento. Así lo deja claro su Art. 3 (d), el cual señala que toda transacción "estará sujeta además a cualquier otra ley aplicable". Art. 3 (d) de la Ley Núm. 148-2006, *supra*.

**En sintonía con lo anterior, el Art. 5 de la Ley Núm. 148-2006,** *supra*, **aclara que sus disposiciones solamente aplicarán a negocios jurídicos efectuados "entre dos o más partes, cada una de las cuales haya acordado realizar Transacciones por medios electrónicos", para lo cual se considerará "el contexto y las circunstancias que rodean la Transacción, incluyendo la conducta de las partes".** (Énfasis suplido). Art. 5 (b) de la Ley Núm. 148-2006, *supra*. De igual modo, la referida disposición estatutaria establece un derecho irrenunciable mediante el cual una "persona que acuerde efectuar una Transacción por medios electrónicos podrá negarse a efectuar otras Transacciones por medios electrónicos". Art. 5 (c) de la Ley Núm. 148-2006, *supra*.

También, debemos destacar que la Ley Núm. 148-2006, *supra*, provee ciertas salvaguardas. **Específicamernte, dispone que "[s]i quien envía el Documento Electrónico impide que el que lo recibe imprima o almacene el archivo, el Documento Electrónico no será vinculante para el que lo**

**recibe.** (Énfasis suplido). Art. 8 (c) de la Ley Núm. 148-2006, *supra*. **Asimismo, dicta que una firma electrónica "será atribuible a determinada persona si existe por actuación de dicha persona", lo cual se determinará conforme al "contexto y circunstancias de su creación, ejecución o adopción, incluyendo el acuerdo de las partes, si alguno, y de conformidad con cualquier otra ley aplicable".** (Énfasis suplido). Art. 9 de la Ley Núm. 148-2006, *supra*.

**Así pues, y, en definitiva, tanto el propósito como el alcance de la Ley Núm. 148-2006, *supra*, consisten en equiparar a las transacciones electrónicas con los negocios jurídicos celebrados a través de medios análogos o en papel, mas no en sustituir o suplir los requisitos esenciales para el perfeccionamiento de cualquier contrato, a saber: objeto, causa y consentimiento. Por lo tanto, el mero hecho de que se haya empleado uno de los mecanismos electrónicos autorizados no tiene el efecto de perfeccionar un contrato ante una falta de consentimiento. Como adelantamos, en tal deficiencia, precisamente, radica el caso de marras.**

Es, pues, a la luz de la normativa antes expuesta que procedemos a disponer, -- desde la disidencia --, de la controversia planteada en el caso que nos ocupa.

### III.

En esta ocasión, como hemos visto, una mayoría de mis compañeras y compañeros de estrado entendió que se puede prestar un consentimiento válido, **-- aunque una de las partes contratantes alegue que ni tan siquiera tuvo la**

**oportunidad de leer o revisar el contenido de un contrato al que integraron sus iniciales y firmas electrónicas de una manera automatizada --**, para poner en vigor una cláusula de arbitraje y condicionar la continuación de los procedimientos judiciales a la determinación de tal foro privado. Fallan malamente en su proceder.

**Y es que, a partir del cuadro fáctico de autos, -- el cual, como adelantamos, se debe tomar por cierto al tratarse aquí de una solicitud de desestimación bajo la Regla 10.2 de Procedimiento Civil,** *supra* **--, somos de la opinión que, en la etapa procesal en la que se encuentra la causa de epígrafe, no procede un fallo desestimatorio ni una suspensión de los procedimientos, por no ser de aplicación la doctrina de separabilidad antes reseñada.** Lo anterior es así, debido a que estamos ante una alegación de ausencia total del elemento de consentimiento, requerido para perfeccionar cualquier acuerdo en nuestra jurisdicción. En consecuencia, -- y, dada la clara controversia de si existió, o no, un consentimiento que forjara un contrato, habiéndose planteado que no se tuvo la oportunidad de leer ni de revisar su contenido --, procedía la celebración de una vista evidenciaria en la que la señora Sierra Lugo pudiese probar tales alegaciones.

IV.

Llegar a un resultado distinto, -- como hoy lo hace una mayoría de este Tribunal --, equivaldría a menoscabar o privar de su derecho a tener un día en corte a personas

que, como consecuencia de las nuevas dinámicas que impone la digitalización del tráfico jurídico, se vean precisadas a estampar sus marcas autógrafas a ciegas en aparatos electrónicos, para intentar perfeccionar contratos que van desde la búsqueda desesperada de opciones para enfrentar la crisis energética que atraviesa el País, -- similar a situaciones como las de autos --, hasta acuerdos relativos a otros aspectos trascendentales en sus vidas, como los asuntos médicos y el manejo de su información privada.

Por supuesto, la posición que aquí adoptamos no tiene el alcance de sugerir que la diversidad de contratos que diariamente se suscriben a través de medios electrónicos son nulos por el mero hecho de haberse otorgado digitalmente. Más bien, nuestro planteamiento va dirigido a exponer que, para que se configure un consentimiento que perfeccione un acuerdo vinculante, -- cualquiera que sea --, se requiere que las partes tengan, cuanto menos, una oportunidad real de conocer los términos y condiciones que lo conforman, de modo que exista una correspondencia entre una oferta concreta (objeto y causa) y su aceptación específica (consentimiento).

Concluir lo contrario sería abrir una puerta peligrosa para que la mera otorgación de una firma en el vacío faculte a quien la requiera a comprometer, a su arbitrio, la persona y los bienes de quien la preste, estampando esa marca autógrafa en una infinidad de acuerdos desconocidos e

indeterminables para esta última. A ello, el Juez que suscribe no le puede imprimir un voto de conformidad.

V.

Es, pues, por todo lo antes expuesto que disentimos del curso de acción seguido en el día de hoy por una mayoría de mis compañeras y compañeros de estado.


Ángel Colón Pérez
Juez Asociado